MILLIKEN, GOVERNOR OF MICHIGAN, ET AL. *v.*
BRADLEY ET AL.

No. 73–434. Argued February 27, 1974—Decided July 25, 1974*

---

*Together with No. 73–435, *Allen Park Public Schools et al.* v.
*Bradley et al.*, and No. 73–436, *Grosse Pointe Public School System*
v. *Bradley et al.*, also on certiorari to the same court.

*Frank J. Kelley,* Attorney General of Michigan, argued the cause for petitioners in No. 73–434. With him on the brief were *Robert A. Derengoski,* Solicitor General, and *Eugene Krasicky, Gerald F. Young, George L. McCargar,* and *Thomas F. Schimpf,* Assistant Attorneys General. *William M. Saxton* argued the cause for petitioners in Nos. 73–435 and 73–436. With him on the brief in No. 73–435 were *John B. Weaver, Robert M. Vercruysse,* and *Xhafer Orhan. Douglas H. West* filed a brief for petitioner in No. 73–436.

*J. Harold Flannery* and *Nathaniel R. Jones* argued the cause for respondents in all cases. With them on the brief for respondents Bradley et al. were *Jack Greenberg, Norman Chachkin,* and *Louis R. Lucas. George T. Roumell, Jr.,* and *C. Nicholas Revelos* filed a brief for respondents Board of Education for the School District of the city of Detroit et al. *John Bruff* and *William Ross* filed a brief for respondent Professional Personnel of Van

Dyke. *Robert J. Lord* filed a brief for respondents' Green et al.

*Solicitor General Bork* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief was *Assistant Attorney General Pottinger*.†

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari in these consolidated cases to determine whether a federal court may impose a multi-district, areawide remedy to a single-district *de jure* segregation problem absent any finding that the other included school districts have failed to operate unitary school systems within their districts, absent any claim or finding that the boundary lines of any affected school district were established with the purpose of fostering racial segregation in public schools, absent any finding that the included districts committed acts which effected segregation within the other districts, and absent a

---

†Briefs of *amici curiae* urging reversal were filed by *Theodore L. Sendak,* Attorney General, *Donald P. Bogard,* Deputy Attorney General, and *William F. Harvey* for the State of Indiana; by *Lewis C. Bose* and *William M. Evans* for the Metropolitan School District of Lawrence Township, Indiana, et al.; by *Richard D. Wagner* and *Richard L. Brown* for the town of Speedway, Indiana, et al.; and by *Harold H. Fuhrman* for the National Suburban League, Ltd.

Briefs of *amici curiae* urging affirmance were filed by *Leonard P. Strickman* for the city of Boston, Massachusetts; by *Alexander A. Goldfarb* for the city of Hartford, Connecticut; by *Sanford Jay Rosen* for the Mexican American Legal Defense and Educational Fund; and by Inter-Faith Centers for Racial Justice, Inc.

Briefs of *amici curiae* were filed by *Charles F. Clippert, Charles E. Keller, Thomas H. Schwarze, John F. Shantz, Raymond McPeters, Walter J. Guth, Jr., Raymond G. Glime, Tony Ferris,* and *Perry Christy* for Bloomfield Hills School District et al.; by *Stephen J. Pollak, Richard M. Sharp,* and *David Rubin* for the National Education Assn.; and by *David I. Caplan* for the Jewish Rights Council.

meaningful opportunity for the included neighboring school districts to present evidence or be heard on the propriety of a multidistrict remedy or on the question of constitutional violations by those neighboring districts.[1]

## I

The action was commenced in August 1970 by the respondents, the Detroit Branch of the National Association for the Advancement of Colored People[2] and individual parents and students, on behalf of a class later defined by order of the United States District Court for the Eastern District of Michigan, dated February 16, 1971, to include "all school children in the City of Detroit, Michigan, and all Detroit resident parents who have children of school age." The named defendants in the District Court included the Governor of Michigan, the Attorney General, the State Board of Education, the State Superintendent of Public Instruction, the Board of Education of the city of Detroit, its members, and the city's former superintendent of schools. The State of Michigan as such is not a party to this litigation and references to the State must be read as references to the public officials, state and local, through whom the State is alleged to have acted. In their complaint respondents attacked the constitutionality of a statute of the State of Michigan known as Act 48 of the 1970 Legislature on the ground that it put the State of Michigan in the position of unconstitutionally interfering with the execution and operation of a voluntary plan of partial high school desegregation, known as the April 7, 1970, Plan, which had been adopted by the Detroit Board of Education to be effective beginning

---

[1] 484 F. 2d 215 (CA6), cert. granted, 414 U. S. 1038 (1973).

[2] The standing of the NAACP as a proper party plaintiff was not contested in the trial court and is not an issue in this case.

with the fall 1970 semester. The complaint also alleged that the Detroit Public School System was and is segregated on the basis of race as a result of the official policies and actions of the defendants and their predecessors in office, and called for the implementation of a plan that would eliminate "the racial identity of every school in the [Detroit] system and . . . maintain now and hereafter a unitary, nonracial school system."

Initially the matter was tried on respondents' motion for a preliminary injunction to restrain the enforcement of Act 48 so as to permit the April 7 Plan to be implemented. On that issue, the District Court ruled that respondents were not entitled to a preliminary injunction since at that stage there was no proof that Detroit had a dual segregated school system. On appeal, the Court of Appeals found that the "implementation of the April 7 plan was [unconstitutionally] thwarted by State action in the form of the Act of the Legislature of Michigan," 433 F. 2d 897, 902 (CA6 1970), and that such action could not be interposed to delay, obstruct, or nullify steps lawfully taken for the purpose of protecting rights guaranteed by the Fourteenth Amendment. The case was remanded to the District Court for an expedited trial on the merits.

On remand, the respondents moved for immediate implementation of the April 7 Plan in order to remedy the deprivation of the claimed constitutional rights. In response, the School Board suggested two other plans, along with the April 7 Plan, and urged that top priority be assigned to the so-called "Magnet Plan" which was "designed to attract children to a school because of its superior curriculum." The District Court approved the Board's Magnet Plan, and respondents again appealed to the Court of Appeals, moving for summary reversal. The Court of Appeals refused to pass on the merits of the Magnet Plan and ruled that the District Court had

not abused its discretion in refusing to adopt the April 7
Plan without an evidentiary hearing. The case was again
remanded with instructions to proceed immediately to a
trial on the merits of respondents' substantive allegations
concerning the Detroit school system. 438 F. 2d 945
(CA6 1971).

The trial of the issue of segregation in the Detroit
school system began on April 6, 1971, and continued
through July 22, 1971, consuming some 41 trial days.
On September 27, 1971, the District Court issued its find-
ings and conclusions on the issue of segregation, finding
that "Governmental actions and inaction at all levels,
federal, state and local, have combined, with those of
private organizations, such as loaning institutions and
real estate associations and brokerage firms, to establish
and to maintain the pattern of residential segregation
throughout the Detroit metropolitan area." 338 F. Supp.
582, 587 (ED Mich. 1971). While still addressing a
Detroit-only violation, the District Court reasoned:

> "While it would be unfair to charge the present de-
> fendants with what other governmental officers or
> agencies have done, it can be said that the actions or
> the failure to act by the responsible school authori-
> ties, both city and state, were linked to that of these
> other governmental units. When we speak of gov-
> ernmental action we should not view the different
> agencies as a collection of unrelated units. Perhaps
> the most that can be said is that all of them, includ-
> ing the school authorities, are, in part, responsible
> for the segregated condition which exists. And we
> note that just as there is an interaction between
> residential patterns and the racial composition of
> the schools, so there is a corresponding effect on the
> residential pattern by the racial composition of the
> schools." *Ibid.*

The District Court found that the Detroit Board of Education created and maintained optional attendance zones [3] within Detroit neighborhoods undergoing racial transition and between high school attendance areas of opposite predominant racial compositions. These zones, the court found, had the "natural, probable, foreseeable and actual effect" of allowing white pupils to escape identifiably Negro schools. *Ibid.* Similarly, the District Court found that Detroit school attendance zones had been drawn along north-south boundary lines despite the Detroit Board's awareness that drawing boundary lines in an east-west direction would result in significantly greater desegregation. Again, the District Court concluded, the natural and actual effect of these acts was the creation and perpetuation of school segregation within Detroit.

The District Court found that in the operation of its school transportation program, which was designed to relieve overcrowding, the Detroit Board had admittedly bused Negro Detroit pupils to predominantly Negro schools which were beyond or away from closer white schools with available space.[4] This practice was found to have continued in recent years despite the Detroit Board's avowed policy, adopted in 1967, of utilizing transportation to increase desegregation:

"With one exception (necessitated by the burning of a white school), defendant Board has never bused

[3] Optional zones, sometimes referred to as dual zones or dual overlapping zones, provide pupils living within certain areas a choice of attendance at one of two high schools.

[4] The Court of Appeals found record evidence that in at least one instance during the period 1957–1958, Detroit served a suburban school district by contracting with it to educate its Negro high school students by transporting them away from nearby suburban white high schools, and past Detroit high schools which were predominantly white, to all-Negro or predominantly Negro Detroit schools. 484 F. 2d, at 231.

white children to predominantly black schools. The Board has not bused white pupils to black schools despite the enormous amount of space available in inner-city schools. There were 22,961 vacant seats in schools 90% or more black." *Id.*, at 588.

With respect to the Detroit Board of Education's practices in school construction, the District Court found that Detroit school construction generally tended to have a segregative effect with the great majority of schools being built in either overwhelmingly all-Negro or all-white neighborhoods so that the new schools opened as predominantly one-race schools. Thus, of the 14 schools which opened for use in 1970–1971, 11 opened over 90% Negro and one opened less than 10% Negro.

The District Court also found that the State of Michigan had committed several constitutional violations with respect to the exercise of its general responsibility for, and supervision of, public education.[5] The State, for example, was found to have failed, until the 1971 Session of the Michigan Legislature, to provide authorization or

---

[5] School districts in the State of Michigan are instrumentalities of the State and subordinate to its State Board of Education and legislature. The Constitution of the State of Michigan, Art. 8, § 2, provides in relevant part:

"The legislature shall maintain and support a system of free public elementary and secondary schools as defined by law."

Similarly, the Michigan Supreme Court has stated: "The school district is a State agency. Moreover, it is of legislative creation. . . ." *Attorney General ex rel. Kies* v. *Lowrey*, 131 Mich. 639, 644, 92 N. W. 289, 290 (1902); " 'Education in Michigan belongs to the State. It is no part of the local self-government inherent in the township or municipality, except so far as the legislature may choose to make it such. The Constitution has turned the whole subject over to the legislature. . . .' " *Attorney General ex rel. Zacharias* v. *Detroit Board of Education*, 154 Mich. 584, 590, 118 N. W. 606, 609 (1908).

funds for the transportation of pupils within Detroit regardless of their poverty or distance from the school to which they were assigned; during this same period the State provided many neighboring, mostly white, suburban districts the full range of state-supported transportation.

The District Court found that the State, through Act 48, acted to "impede, delay and minimize racial integration in Detroit schools." The first sentence of § 12 of Act 48 was designed to delay the April 7, 1970, desegregation plan originally adopted by the Detroit Board. The remainder of § 12 sought to prescribe for each school in the eight districts criteria of "free choice" and "neighborhood schools," which, the District Court found, "had as their purpose and effect the maintenance of segregation." 338 F. Supp., at 589.[6]

The District Court also held that the acts of the Detroit Board of Education, as a subordinate entity of the State, were attributable to the State of Michigan, thus creating a vicarious liability on the part of the State. Under Michigan law, Mich. Comp. Laws § 388.851 (1970), for example, school building construction plans had to be approved by the State Board of Education, and, prior to 1962, the State Board had specific statutory authority to supervise schoolsite selection. The proofs concerning the effect of Detroit's school construction program were,

---

[6] "Sec. 12. The implementation of any attendance provisions for the 1970–71 school year determined by any first class school district board *shall be delayed* pending the date of commencement of functions by the first class school district boards established under the provisions of this amendatory act but such provision shall not impair the right of any such board to determine and implement prior to such date such changes in attendance provisions as are mandated by practical necessity. . . ." Act No. 48, § 12, Mich. Pub. Acts of 1970; Mich. Comp. Laws § 388.182 (1970) (emphasis added).

therefore, found to be largely applicable to show state responsibility for the segregative results.[7]

Turning to the question of an appropriate remedy for these several constitutional violations, the District Court deferred a pending motion [8] by intervening parent de-

---

[7] The District Court briefly alluded to the possibility that the State, along with private persons, had caused, in part, the housing patterns of the Detroit metropolitan area which, in turn, produced the predominantly white and predominantly Negro neighborhoods that characterize Detroit:

"It is no answer to say that restricted practices grew gradually (as the black population in the area increased between 1920 and 1970), or that since 1948 racial restrictions on the ownership of real property have been removed. The policies pursued by both government and private persons and agencies have a continuing and present effect upon the complexion of the community—as we know, the choice of a residence is a relatively infrequent affair. For many years FHA and VA openly advised and advocated the maintenance of 'harmonious' neighborhoods, i. e., racially and economically harmonious. The conditions created continue." 338 F. Supp. 582, 587 (ED Mich. 1971).

Thus, the District Court concluded:

"The affirmative obligation of the defendant Board has been and is to adopt and implement pupil assignment practices and policies that compensate for and avoid incorporation into the school system the effects of residential racial segregation." Id., at 593.

The Court of Appeals, however, expressly noted that:

"In affirming the District Judge's findings of constitutional violations by the Detroit Board of Education and by the State defendants resulting in segregated schools in Detroit, we have not relied at all upon testimony pertaining to segregated housing except as school construction programs helped cause or maintain such segregation." 484 F. 2d, at 242.

Accordingly, in its present posture, the case does not present any question concerning possible state housing violations.

[8] On March 22, 1971, a group of Detroit residents, who were parents of children enrolled in the Detroit public schools, were permitted to intervene as parties defendant. On June 24, 1971, the District Judge alluded to the "possibility" of a metropolitan school system stating: "[A]s I have said to several witnesses in this case:

fendants to join as additional parties defendant the 85 outlying school districts in the three-county Detroit metropolitan area on the ground that effective relief could not be achieved without their presence.[9]  The District Court concluded that this motion to join was "premature," since it "has to do with relief" and no reasonably specific desegregation plan was before the court.  338 F. Supp., at 595.  Accordingly, the District Court proceeded to order the Detroit Board of Education to submit desegregation plans limited to the segregation problems found to be existing within the city of Detroit.  At the same time, however, the state defendants were directed to submit desegregation plans encompassing the three-county metropolitan area [10] despite the fact that the 85 outlying school

---

'How do you desegregate a black city, or a black school system.'"  Petitioners' Appendix 243a (hereinafter Pet. App.).  Subsequently, on July 16, 1971, various parents filed a motion to require joinder of all of the 85 outlying independent school districts within the tricounty area.

[9] The respondents, as plaintiffs below, opposed the motion to join the additional school districts, arguing that the presence of the state defendants was sufficient and all that was required, even if, in shaping a remedy, the affairs of these other districts was to be affected. 338 F. Supp., at 595.

[10] At the time of the 1970 census, the population of Michigan was 8,875,083, almost half of which, 4,199,931, resided in the tri-county area of Wayne, Oakland, and Macomb.  Oakland and Macomb Counties abut Wayne County to the north, and Oakland County abuts Macomb County to the west.  These counties cover 1,952 square miles, Michigan Statistical Abstract (9th ed. 1972), and the area is approximately the size of the State of Delaware (2,057 square miles), more than half again the size of the State of Rhode Island (1,214 square miles) and almost 30 times the size of the District of Columbia (67 square miles).  Statistical Abstract of the United States (93d ed. 1972).  The populations of Wayne, Oakland, and Macomb Counties were 2,666,751; 907,871; and 625,309, respectively, in 1970.  Detroit, the State's largest city, is located in Wayne County.

In the 1970–1971 school year, there were 2,157,449 children enrolled in school districts in Michigan.  There are 86 independent,

districts of these three counties were not parties to the action and despite the fact that there had been no claim that these outlying districts had committed constitutional violations.[11] An effort to appeal these orders to the Court of Appeals was dismissed on the ground that the orders were not appealable. 468 F. 2d 902 (CA6), cert. denied, 409 U. S. 844 (1972). The sequence of the ensuing actions and orders of the District Court are significant factors and will therefore be catalogued in some detail.

Following the District Court's abrupt announcement that it planned to consider the implementation of a multidistrict, metropolitan area remedy to the segregation problems identified within the city of Detroit, the District Court was again requested to grant the outlying school districts intervention as of right on the ground that the District Court's new request for multidistrict plans "may, as a practical matter, impair or impede [the intervenors'] ability to protect" the welfare of their students. The District Court took the motions to intervene under advisement pending submission of the requested desegregation plans by Detroit and the state officials. On March 7, 1972, the District Court notified all parties and the petitioner school districts seeking intervention, that March 14, 1972, was the deadline for submission of recommendations for conditions of intervention and the

legally distinct school districts within the tri-county area, having a total enrollment of approximately 1,000,000 children. In 1970, the Detroit Board of Education operated 319 schools with approximately 276,000 students.

[11] In its formal opinion, subsequently announced, the District Court candidly recognized:

"It should be noted that the court has taken no proofs with respect to the establishment of the boundaries of the 86 public school districts in the counties of Wayne, Oakland and Macomb, nor on the issue of whether, with the exclusion of the city of Detroit school district, such school districts have committed acts of de jure segregation." 345 F. Supp. 914, 920 (ED Mich. 1972).

date of the commencement of hearings on Detroit-only desegregation plans. On the second day of the scheduled hearings, March 15, 1972, the District Court granted the motions of the intervenor school districts [12] subject, *inter alia*, to the following conditions:

"1. No intervenor will be permitted to assert any claim or defense previously adjudicated by the court.

"2. No intervenor shall reopen any question or issue which has previously been decided by the court.

.    .    .    .    .

"7. New intervenors are granted intervention for two principal purposes: (a) To advise the court, by brief, of the legal propriety or impropriety of considering a metropolitan plan; (b) To review any plan or plans for the desegregation of the so-called larger Detroit Metropolitan area, and submitting objections, modifications or alternatives to it or them, and in accordance with the requirements of the United States Constitution and the prior orders of this court." 1 Joint Appendix 206 (hereinafter App.).

Upon granting the motion to intervene, on March 15, 1972, the District Court advised the petitioning intervenors that the court had previously set March 22, 1972, as the date for the filing of briefs on the legal propriety of a "metropolitan" plan of desegregation and, accordingly, that the intervening school districts would have one week to muster their legal arguments on the issue.[13]

---

[12] According to the District Court, intervention was permitted under Fed. Rule Civ. Proc. 24 (a), "Intervention of Right," and also under Rule 24(b), "Permissive Intervention."

[13] This rather abbreviated briefing schedule was maintained despite the fact that the District Court had deferred consideration of a motion made eight months earlier, to bring the suburban districts into the case. See text accompanying n. 8, *supra*.

Thereafter, and following the completion of hearings on the Detroit-only desegregation plans, the District Court issued the four rulings that were the principal issues in the Court of Appeals.

(a) On March 24, 1972, two days after the intervenors' briefs were due, the District Court issued its ruling on the question of whether it could "consider relief in the form of a metropolitan plan, encompassing not only the City of Detroit, but the larger Detroit metropolitan area." It rejected the state defendants' arguments that no state action caused the segregation of the Detroit schools, and the intervening suburban districts' contention that interdistrict relief was inappropriate unless the suburban districts themselves had committed violations. The court concluded:

> "[I]t is proper for the court to consider metropolitan plans directed toward the desegregation of the Detroit public schools as an alternative to the present intra-city desegregation plans before it and, in the event that the court finds such intra-city plans inadequate to desegregate such schools, the court is of the opinion that it is required to consider a metropolitan remedy for desegregation." Pet. App. 51a.

(b) On March 28, 1972, the District Court issued its findings and conclusions on the three Detroit-only plans submitted by the city Board and the respondents. It found that the best of the three plans "would make the Detroit school system more identifiably Black . . . thereby increasing the flight of Whites from the city and the system." *Id.*, at 55a. From this the court concluded that the plan "would not accomplish desegregation . . . within the corporate geographical limits of the city." *Id.*, at 56a. Accordingly, the District Court held that it "must look beyond the limits of the Detroit school

district for a solution to the problem," and that "[s]chool district lines are simply matters of political convenience and may not be used to deny constitutional rights." *Id.,* at 57a.

(c) During the period from March 28 to April 14, 1972, the District Court conducted hearings on a metropolitan plan. Counsel for the petitioning intervenors was allowed to participate in these hearings, but he was ordered to confine his argument to "the size and expanse of the metropolitan plan" without addressing the intervenors' opposition to such a remedy or the claim that a finding of a constitutional violation by the intervenor districts was an essential predicate to any remedy involving them. Thereafter, on June 14, 1972, the District Court issued its ruling on the "desegregation area" and related findings and conclusions. The court acknowledged at the outset that it had "taken no proofs with respect to the establishment of the boundaries of the 86 public school districts in the counties [in the Detroit area], nor on the issue of whether, with the exclusion of the city of Detroit school district, such school districts have committed acts of de jure segregation." Nevertheless, the court designated 53 of the 85 suburban school districts plus Detroit as the "desegregation area" and appointed a panel to prepare and submit "an effective desegregation plan" for the Detroit schools that would encompass the entire desegregation area.[14] The plan was to be based on 15 clusters, each containing part of the Detroit system and two or more suburban districts,

---

[14] As of 1970, the 53 school districts outside the city of Detroit that were included in the court's "desegregation area" had a combined student population of approximately 503,000 students compared to Detroit's approximately 276,000 students. Nevertheless, the District Court directed that the intervening districts should be represented by only cne member on the desegregation panel while the Detroit Board of Education was granted three panel members. 345 F. Supp., at 917.

and was to "achieve the greatest degree of actual deseg-
regation to the end that, upon implementation, no school,
grade or classroom [would be] substantially dispropor-
tionate to the overall pupil racial composition." 345 F.
Supp. 914, 918 (ED Mich. 1972).

(d) On July 11, 1972, and in accordance with a recom-
mendation by the court-appointed desegregation panel,
the District Court ordered the Detroit Board of Educa-
tion to purchase or lease "at least" 295 school buses for
the purpose of providing transportation under an interim
plan to be developed for the 1972–1973 school year. The
costs of this acquisition were to be borne by the state
defendants. Pet. App. 106a–107a.

On June 12, 1973, a divided Court of Appeals, sitting
en banc, affirmed in part, vacated in part, and remanded
for further proceedings. 484 F. 2d 215 (CA6).[15]
The Court of Appeals held, first, that the record sup-
ported the District Court's findings and conclusions on
the constitutional violations committed by the Detroit
Board, id., at 221–238, and by the state defendants, id.,
at 239–241.[16] It stated that the acts of racial discrimina-

---

[15] The District Court had certified most of the foregoing rulings for
interlocutory review pursuant to 28 U. S. C. § 1292 (b) (1 App. 265–
266) and the case was initially decided on the merits by a panel of
three judges. However, the panel's opinion and judgment were
vacated when it was determined to rehear the case en banc, 484 F. 2d,
at 218.

[16] With respect to the State's violations, the Court of Appeals
held: (1) that, since the city Board is an instrumentality of the
State and subordinate to the State Board, the segregative actions of
the Detroit Board "are the actions of an agency of the State,"
id., at 238; (2) that the state legislation rescinding Detroit's
voluntary desegregation plan contributed to increasing segregation
in the Detroit schools, ibid.; (3) that under state law prior to 1962
the State Board had authority over school construction plans and
therefore had to be held responsible "for the segregative results,"

tion shown in the record are "causally related to the substantial amount of segregation found in the Detroit school system," *id.,* at 241, and that "the District Court was therefore authorized and required to take effective measures to desegregate the Detroit Public School System." *Id.,* at 242.

The Court of Appeals also agreed with the District Court that "any less comprehensive a solution than a metropolitan area plan would result in an all black school system immediately surrounded by practically all white suburban school systems, with an overwhelmingly white majority population in the total metropolitan area." *Id.,* at 245. The court went on to state that it could "not see how such segregation can be any less harmful to the minority students than if the same result were accomplished within one school district." *Ibid.*

Accordingly, the Court of Appeals concluded that "the only feasible desegregation plan involves the crossing of the boundary lines between the Detroit School District and adjacent or nearby school districts for the limited purpose of providing an effective desegregation plan." *Id.,* at 249. It reasoned that such a plan would be appropriate because of the State's violations, and could be implemented because of the State's authority to control local school districts. Without further elaboration, and without any discussion of the claims that no constitutional violation by the outlying districts had been

---

*ibid.;* (4) that the "State statutory scheme of support of transportation for school children directly discriminated against Detroit," *id.,* at 240, by not providing transportation funds to Detroit on the same basis as funds were provided to suburban districts, *id.,* at 238; and (5) that the transportation of Negro students from one suburban district to a Negro school in Detroit must have had the "approval, tacit or express, of the State Board of Education," *ibid.*

shown and that no evidence on that point had been allowed, the Court of Appeals held:

> "[T]he State has committed de jure acts of segregation and . . . the State controls the instrumentalities whose action is necessary to remedy the harmful effects of the State acts." *Ibid.*

An interdistrict remedy was thus held to be "within the equity powers of the District Court." *Id.*, at 250.[17]

The Court of Appeals expressed no views on the propriety of the District Court's composition of the metropolitan "desegregation area." It held that all suburban school districts that might be affected by any metropolitanwide remedy should, under Fed. Rule Civ. Proc. 19, be made parties to the case on remand and be given an opportunity to be heard with respect to the scope and implementation of such a remedy. 484 F. 2d, at 251–252. Under the terms of the remand, however, the District Court was not "required" to receive further evidence on the issue of segregation in the Detroit schools or on the propriety of a Detroit-only remedy, or on the question of whether the affected districts had committed any violation of the constitutional rights of Detroit pupils or others. *Id.*, at 252. Finally, the Court of Appeals vacated the District Court's order directing the acquisition of school buses, subject to the right of the District Court to consider reimposing the order "at the appropriate time." *Ibid.*

---

[17] The court sought to distinguish *Bradley* v. *School Board of the City of Richmond*, 462 F. 2d 1058 (CA4 1972), aff'd by an equally divided Court, 412 U. S. 92 (1973), on the grounds that the District Court in that case had ordered an actual consolidation of three school districts and that Virginia's Constitution and statutes, unlike Michigan's, gave the local boards exclusive power to operate the public schools. 484 F. 2d, at 251.

## II

Ever since *Brown* v. *Board of Education,* 347 U. S. 483 (1954), judicial consideration of school desegregation cases has begun with the standard:

> "[I]n the field of public education the doctrine of 'separate but equal' has no place.  Separate educational facilities are inherently unequal."  *Id.,* at 495.

This has been reaffirmed time and again as the meaning of the Constitution and the controlling rule of law.

The target of the *Brown* holding was clear and forthright: the elimination of state-mandated or deliberately maintained dual school systems with certain schools for Negro pupils and others for white pupils.  This duality and racial segregation were held to violate the Constitution in the cases subsequent to 1954, including particularly *Green* v. *County School Board of New Kent County,* 391 U. S. 430 (1968); *Raney* v. *Board of Education,* 391 U. S. 443 (1968); *Monroe* v. *Board of Comm'rs,* 391 U. S. 450 (1968); *Swann* v. *Charlotte-Mecklenburg Board of Education,* 402 U. S. 1 (1971); *Wright* v. *Council of the City of Emporia,* 407 U. S. 451 (1972); *United States* v. *Scotland Neck Board of Education,* 407 U. S. 484 (1972).

The *Swann* case, of course, dealt

> "with the problem of defining in more precise terms than heretofore the scope of the duty of school authorities and district courts in implementing *Brown I* and the mandate to eliminate dual systems and establish unitary systems at once."  402 U. S., at 6.

In *Brown* v. *Board of Education,* 349 U. S. 294 (1955) (*Brown II*), the Court's first encounter with the problem of remedies in school desegregation cases, the Court noted:

> "In fashioning and effectuating the decrees, the courts will be guided by equitable principles.  Tra-

ditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs." *Id.*, at 300 (footnotes omitted).

In further refining the remedial process, *Swann* held, the task is to correct, by a balancing of the individual and collective interests, "the condition that offends the Constitution." A federal remedial power may be exercised "only on the basis of a constitutional violation" and, "[a]s with any equity case, the nature of the violation determines the scope of the remedy." 402 U. S., at 16.

Proceeding from these basic principles, we first note that in the District Court the complainants sought a remedy aimed at the *condition* alleged to offend the Constitution—the segregation within the Detroit City School District.[18] The court acted on this theory of the case and in its initial ruling on the "Desegregation Area" stated:

"The task before this court, therefore, is now, and . . . has always been, how to desegregate the Detroit public schools." 345 F. Supp., at 921.

Thereafter, however, the District Court abruptly rejected the proposed Detroit-only plans on the ground that "while [they] would provide a racial mix more in keeping with the Black-White proportions of the student population [they] would accentuate the racial identifiability of the

---

[18] Although the list of issues presented for review in petitioners' briefs and petitions for writs of certiorari do not include arguments on the findings of segregative violations on the part of the Detroit defendants, two of the petitioners argue in brief that these findings constitute error. This Court's Rules 23 (1) (c) and 40 (1) (d) (2), at a minimum, limit our review of the Detroit violation findings to "plain error," and, under our decision last Term in *Keyes* v. *School District No. 1, Denver, Colorado,* 413 U. S. 189 (1973), the findings appear to be correct.

[Detroit] district as a Black school system, and would not accomplish desegregation." Pet. App. 56a. "[T]he racial composition of the student body is such," said the court, "that the plan's implementation would clearly make the entire Detroit public school system racially identifiable" (*id.*, at 54a), "leav[ing] many of its schools 75 to 90 per cent Black." *Id.*, at 55a. Consequently, the court reasoned, it was imperative to "look beyond the limits of the Detroit school district for a solution to the problem of segregation in the Detroit public schools . . ." since "[s]chool district lines are simply matters of political convenience and may not be used to deny constitutional rights." *Id.*, at 57a. Accordingly, the District Court proceeded to redefine the relevant area to include areas of predominantly white pupil population in order to ensure that "upon implementation, no school, grade or classroom [would be] substantially disproportionate to the overall pupil racial composition" of the entire metropolitan area.

While specifically acknowledging that the District Court's findings of a condition of segregation were limited to Detroit, the Court of Appeals approved the use of a metropolitan remedy largely on the grounds that it is

> "impossible to declare 'clearly erroneous' the District Judge's conclusion that any Detroit only segregation plan will lead directly to a single segregated Detroit school district overwhelmingly black in all of its schools, surrounded by a ring of suburbs and suburban school districts overwhelmingly white in composition in a State in which the racial composition is 87 per cent white and 13 per cent black." 484 F. 2d, at 249.

Viewing the record as a whole, it seems clear that the District Court and the Court of Appeals shifted the pri-

mary focus from a Detroit remedy to the metropolitan area only because of their conclusion that total desegregation of Detroit would not produce the racial balance which they perceived as desirable. Both courts proceeded on an assumption that the Detroit schools could not be truly desegregated—in their view of what constituted desegregation—unless the racial composition of the student body of each school substantially reflected the racial composition of the population of the metropolitan area as a whole. The metropolitan area was then defined as Detroit plus 53 of the outlying school districts. That this was the approach the District Court expressly and frankly employed is shown by the order which expressed the court's view of the constitutional standard:

> "Within the limitations of reasonable travel time and distance factors, pupil reassignments shall be effected within the clusters described in Exhibit P. M. 12 so as to achieve the greatest degree of actual desegregation to the end that, upon implementation, *no school, grade or classroom* [will be] substantially disproportionate to the overall pupil racial composition." 345 F. Supp., at 918 (emphasis added).

In *Swann,* which arose in the context of a single independent school district, the Court held:

> "If we were to read the holding of the District Court to require, as a matter of substantive constitutional right, any particular degree of racial balance or mixing, that approach would be disapproved and we would be obliged to reverse." 402 U. S., at 24.

The clear import of this language from *Swann* is that desegregation, in the sense of dismantling a dual school system, does not require any particular racial balance in

each "school, grade or classroom." [19]  See *Spencer* v. *Kugler,* 404 U. S. 1027 (1972).

Here the District Court's approach to what constituted "actual desegregation" raises the fundamental question, not presented in *Swann,* as to the circumstances in which a federal court may order desegregation relief that embraces more than a single school district.  The court's analytical starting point was its conclusion that school district lines are no more than arbitrary lines on a map drawn "for political convenience."  Boundary lines may be bridged where there has been a constitutional violation calling for interdistrict relief, but the notion that school district lines may be casually ignored or treated as a mere administrative convenience is contrary to the history of public education in our country.  No single tradition in public education is more deeply rooted than local control over the operation of schools; local autonomy has long been thought essential both to the maintenance of community concern and support for public schools and to

---

[19] Disparity in the racial composition of pupils within a single district may well constitute a "signal" to a district court at the outset, leading to inquiry into the causes accounting for a pronounced racial identifiability of schools within one school system. In *Swann,* for example, we were dealing with a large but single independent school system, and a unanimous Court noted: "Where the ... proposed plan for conversion from a dual to a unitary system contemplates the continued existence of some schools that are all or predominantly of one race [the school authority has] the burden of showing that such school assignments are genuinely nondiscriminatory."  402 U. S., at 26.  See also *Keyes, supra,* at 208. However, the use of significant racial imbalance in schools within an autonomous school district as a signal which operates simply to shift the burden of proof, is a very different matter from equating racial imbalance with a constitutional violation calling for a remedy. *Keyes, supra,* also involved a remedial order within a single autonomous school district.

quality of the educational process. See *Wright* v. *Council of the City of Emporia,* 407 U. S., at 469. Thus, in *San Antonio School District* v. *Rodriguez,* 411 U. S. 1, 50 (1973), we observed that local control over the educational process affords citizens an opportunity to participate in decisionmaking, permits the structuring of school programs to fit local needs, and encourages "experimentation, innovation, and a healthy competition for educational excellence."

The Michigan educational structure involved in this case, in common with most States, provides for a large measure of local control,[20] and a review of the scope and character of these local powers indicates the extent to which the interdistrict remedy approved by the two courts could disrupt and alter the structure of public edu-

---

[20] Under the Michigan School Code of 1955, the local school district is an autonomous political body corporate, operating through a Board of Education popularly elected. Mich. Comp. Laws §§ 340.27, 340.55, 340.107, 340.148, 340.149, 340.188. As such, the day-to-day affairs of the school district are determined at the local level in accordance with the plenary power to acquire real and personal property, §§ 340.26, 340.77, 340.113, 340.165, 340.192, 340.352; to hire and contract with personnel, §§ 340.569, 340.574; to levy taxes for operations, § 340.563; to borrow against receipts, § 340.567; to determine the length of school terms, § 340.575; to control the admission of nonresident students, § 340.582; to determine courses of study, § 340.583; to provide a kindergarten program, § 340.584; to establish and operate vocational schools, § 340.585; to offer adult education programs, § 340.586; to establish attendance areas, § 340.-589; to arrange for transportation of nonresident students, § 340.-591; to acquire transportation equipment, § 340.594; to receive gifts and bequests for educational purposes, § 340.605; to employ an attorney, § 340.609; to suspend or expel students, § 340.613; to make rules and regulations for the operation of schools, § 340.614; to cause to be levied authorized millage, § 340.643a; to acquire property by eminent domain, § 340.711 *et seq.;* and to approve and select textbooks, § 340.882.

cation in Michigan. The metropolitan remedy would require, in effect, consolidation of 54 independent school districts historically administered as separate units into a vast new super school district. See n. 10, *supra*. Entirely apart from the logistical and other serious problems attending large-scale transportation of students, the consolidation would give rise to an array of other problems in financing and operating this new school system. Some of the more obvious questions would be: What would be the status and authority of the present popularly elected school boards? Would the children of Detroit be within the jurisdiction and operating control of a school board elected by the parents and residents of other districts? What board or boards would levy taxes for school operations in these 54 districts constituting the consolidated metropolitan area? What provisions could be made for assuring substantial equality in tax levies among the 54 districts, if this were deemed requisite? What provisions would be made for financing? Would the validity of long-term bonds be jeopardized unless approved by all of the component districts as well as the State? What body would determine that portion of the curricula now left to the discretion of local school boards? Who would establish attendance zones, purchase school equipment, locate and construct new schools, and indeed attend to all the myriad day-to-day decisions that are necessary to school operations affecting potentially more than three-quarters of a million pupils? See n. 10, *supra*.

It may be suggested that all of these vital operational problems are yet to be resolved by the District Court, and that this is the purpose of the Court of Appeals' proposed remand. But it is obvious from the scope of the interdistrict remedy itself that absent a complete restructuring of the laws of Michigan relating to school districts the District Court will become first, a *de facto*

"legislative authority" to resolve these complex questions, and then the "school superintendent" for the entire area. This is a task which few, if any, judges are qualified to perform and one which would deprive the people of control of schools through their elected representatives.

Of course, no state law is above the Constitution. School district lines and the present laws with respect to local control, are not sacrosanct and if they conflict with the Fourteenth Amendment federal courts have a duty to prescribe appropriate remedies. See, *e. g., Wright* v. *Council of the City of Emporia,* 407 U. S. 451 (1972); *United States* v. *Scotland Neck Board of Education,* 407 U. S. 484 (1972) (state or local officials prevented from carving out a new school district from an existing district that was in process of dismantling a dual school system); cf. *Haney* v. *County Board of Education of Sevier County,* 429 F. 2d 364 (CA8 1970) (State contributed to separation of races by drawing of school district lines); *United States* v. *Texas,* 321 F. Supp. 1043 (ED Tex. 1970), aff'd, 447 F. 2d 441 (CA5 1971), cert. denied *sub nom. Edgar* v. *United States,* 404 U. S. 1016 (1972) (one or more school districts created and maintained for one race). But our prior holdings have been confined to violations and remedies within a single school district. We therefore turn to address, for the first time, the validity of a remedy mandating cross-district or interdistrict consolidation to remedy a condition of segregation found to exist in only one district.

The controlling principle consistently expounded in our holdings is that the scope of the remedy is determined by the nature and extent of the constitutional violation. *Swann,* 402 U. S., at 16. Before the boundaries of separate and autonomous school districts may be set aside by consolidating the separate units for remedial purposes or by imposing a cross-district remedy, it must

first be shown that there has been a constitutional violation within one district that produces a significant segregative effect in another district. Specifically, it must be shown that racially discriminatory acts of the state or local school districts, or of a single school district have been a substantial cause of interdistrict segregation. Thus an interdistrict remedy might be in order where the racially discriminatory acts of one or more school districts caused racial segregation in an adjacent district, or where district lines have been deliberately drawn on the basis of race. In such circumstances an interdistrict remedy would be appropriate to eliminate the interdistrict segregation directly caused by the constitutional violation. Conversely, without an interdistrict violation and interdistrict effect, there is no constitutional wrong calling for an interdistrict remedy.

The record before us, voluminous as it is, contains evidence of *de jure* segregated conditions only in the Detroit schools; indeed, that was the theory on which the litigation was initially based and on which the District Court took evidence. See *supra,* at 725–726. With no showing of significant violation by the 53 outlying school districts and no evidence of any interdistrict violation or effect, the court went beyond the original theory of the case as framed by the pleadings and mandated a metropolitan area remedy. To approve the remedy ordered by the court would impose on the outlying districts, not shown to have committed any constitutional violation, a wholly impermissible remedy based on a standard not hinted at in *Brown I* and *II* or any holding of this Court.

In dissent, MR. JUSTICE WHITE and MR. JUSTICE MARSHALL undertake to demonstrate that agencies having statewide authority participated in maintaining the dual school system found to exist in Detroit. They are apparently of the view that once such participation is

shown, the District Court should have a relatively free hand to reconstruct school districts outside of Detroit in fashioning relief. Our assumption, *arguendo,* see *infra,* at 748, that state agencies did participate in the maintenance of the Detroit system, should make it clear that it is not on this point that we part company.[21]   The difference between us arises instead from established doctrine laid down by our cases. *Brown, supra; Green, supra; Swann, supra; Scotland Neck, supra;* and *Emporia, supra,* each addressed the issue of constitutional wrong in terms of an established geographic and administrative school system populated by both Negro and white children.   In such a context, terms such as "unitary" and "dual" systems, and "racially identifiable schools," have meaning, and the necessary federal authority to remedy the constitutional wrong is firmly established. But the remedy is necessarily designed, as all remedies are, to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct.   Disparate treatment of white and Negro students occurred within the Detroit school system, and not elsewhere, and on this record the remedy must be limited to that system.  *Swann, supra,* at 16.

The constitutional right of the Negro respondents residing in Detroit is to attend a unitary school system in that district.   Unless petitioners drew the district lines in a discriminatory fashion, or arranged for white stu-

---

[21] Since the Court has held that a resident of a school district has a fundamental right protected by the Federal Constitution to vote in a district election, it would seem incongruous to disparage the importance of the school district in a different context.  *Kramer* v. *Union Free School District No. 15,* 395 U. S. 621, 626 (1969). While the district there involved was located in New York, none of the facts in our possession suggest that the relation of school districts to the State is significantly different in New York from that in Michigan.

dents residing in the Detroit District to attend schools in Oakland and Macomb Counties, they were under no constitutional duty to make provisions for Negro students to do so. The view of the dissenters, that the existence of a dual system in *Detroit* can be made the basis for a decree requiring cross-district transportation of pupils, cannot be supported on the grounds that it represents merely the devising of a suitably flexible remedy for the violation of rights already established by our prior decisions. It can be supported only by drastic expansion of the constitutional right itself, an expansion without any support in either constitutional principle or precedent.[22]

---

[22] The suggestion in the dissent of MR JUSTICE MARSHALL that schools which have a majority of Negro students are not "desegregated," whatever the racial makeup of the school district's population and however neutrally the district lines have been drawn and administered, finds no support in our prior cases. In *Green* v. *County School Board of New Kent County,* 391 U. S. 430 (1968), for example, this Court approved a desegregation plan which would have resulted in each of the schools within the district having a racial composition of 57% Negro and 43% white. In *Wright* v. *Council of the City of Emporia,* 407 U. S. 451 (1972), the optimal desegregation plan would have resulted in the schools' being 66% Negro and 34% white, substantially the same percentages as could be obtained under one of the plans involved in this case. And in *United States* v. *Scotland Neck Board of Education,* 407 U. S. 484, 491 n. 5 (1972), a desegregation plan was implicitly approved for a school district which had a racial composition of 77% Negro and 22% white. In none of these cases was it even intimated that "actual desegregation" could not be accomplished as long as the number of Negro students was greater than the number of white students.

The dissents also seem to attach importance to the metropolitan character of Detroit and neighboring school districts. But the constitutional principles applicable in school desegregation cases cannot vary in accordance with the size or population dispersal of the particular city, county, or school district as compared with neighboring areas.

## III

We recognize that the six-volume record presently under consideration contains language and some specific incidental findings thought by the District Court to afford a basis for interdistrict relief. However, these comparatively isolated findings and brief comments concern only one possible interdistrict violation and are found in the context of a proceeding that, as the District Court conceded, included no proof of segregation practiced by any of the 85 suburban school districts surrounding Detroit. The Court of Appeals, for example, relied on five factors which, it held, amounted to unconstitutional state action with respect to the violations found in the Detroit system:

(1) It held the State derivatively responsible for the Detroit Board's violations on the theory that actions of Detroit as a political subdivision of the State were attributable to the State. Accepting, *arguendo,* the correctness of this finding of state responsibility for the segregated conditions within the city of Detroit, it does not follow that an interdistrict remedy is constitutionally justified or required. With a single exception, discussed later, there has been no showing that either the State or any of the 85 outlying districts engaged in activity that had a cross-district effect. The boundaries of the Detroit School District, which are coterminous with the boundaries of the city of Detroit, were established over a century ago by neutral legislation when the city was incorporated; there is no evidence in the record, nor is there any suggestion by the respondents, that either the original boundaries of the Detroit School District, or any other school district in Michigan, were established for the purpose of creating, maintaining, or perpetuating segregation of races. There is no claim and there is no evidence hinting that petitioner outlying school districts and their

predecessors, or the 30-odd other school districts in the tricounty area—but outside the District Court's "desegregation area"—have ever maintained or operated anything but unitary school systems. Unitary school systems have been required for more than a century by the Michigan Constitution as implemented by state law.[23] Where the schools of only one district have been affected, there is no constitutional power in the courts to decree relief balancing the racial composition of that district's schools with those of the surrounding districts.

(2) There was evidence introduced at trial that, during the late 1950's, Carver School District, a predominantly Negro suburban district, contracted to have Negro high school students sent to a predominantly Negro school in Detroit. At the time, Carver was an independent school district that had no high school because, according to the trial evidence, "Carver District . . . did not have a place for adequate high school facilities." 484 F. 2d, at 231. Accordingly, arrangements were made with Northern High School in the abutting Detroit School District so that the Carver high school students could obtain a secondary school education. In 1960 the Oak Park School District, a predominantly white suburban district, annexed the predominantly Negro Carver School District, through the initiative of local officials.

---

[23] *People ex rel. Workman* v. *Board of Education of Detroit,* 18 Mich. 400 (1869); Act 34, § 28, Mich. Pub. Acts of 1867. The Michigan Constitution and laws provide that "[e]very school district shall provide for the education of its pupils without discrimination as to religion, creed, race, color or national origin," Mich. Const. 1963, Art. 8, § 2; that "[n]o separate school or department shall be kept for any person or persons on account of race or color," Mich. Comp. Laws § 340.355; and that "[a]ll persons, residents of a school district . . . shall have an equal right to attend school therein," *id.,* § 340.356. See also Act 319, Part II, c. 2, § 9, Mich. Pub. Acts of 1927.

*Ibid.* There is, of course, no claim that the 1960 annexation had a segregative purpose or result or that Oak Park now maintains a dual system.

According to the Court of Appeals, the arrangement during the late 1950's which allowed Carver students to be educated within the Detroit District was dependent upon the "tacit or express" approval of the State Board of Education and was the result of the refusal of the white suburban districts to accept the Carver students. Although there is nothing in the record supporting the Court of Appeals' supposition that suburban white schools refused to accept the Carver students, it appears that this situation, whether with or without the State's consent, may have had a segregative effect on the school populations of the two districts involved. However, since "the nature of the violation determines the scope of the remedy," *Swann*, 402 U. S., at 16, this isolated instance affecting two of the school districts would not justify the broad metropolitanwide remedy contemplated by the District Court and approved by the Court of Appeals, particularly since it embraced potentially 52 districts having no responsibility for the arrangement and involved 503,000 pupils in addition to Detroit's 276,000 students.

(3) The Court of Appeals cited the enactment of state legislation (Act 48) which had the effect of rescinding Detroit's voluntary desegregation plan (the April 7 Plan). That plan, however, affected only 12 of 21 Detroit high schools and had no causal connection with the distribution of pupils by race between Detroit and the other school districts within the tri-county area.

(4) The court relied on the State's authority to supervise schoolsite selection and to approve building construction as a basis for holding the State responsible for the segregative results of the school construction program in Detroit. Specifically, the Court of Appeals asserted

that during the period between 1949 and 1962 the State Board of Education exercised general authority as overseer of site acquisitions by local boards for new school construction, and suggested that this state-approved school construction "fostered segregation throughout the Detroit Metropolitan area." 484 F. 2d, at 241. This brief comment, however, is not supported by the evidence taken at trial since that evidence was specifically limited to proof that schoolsite acquisition and school construction within the city of Detroit produced *de jure* segregation *within* the city itself. *Id.,* at 235–238. Thus, there was no evidence suggesting that the State's activities with respect to either school construction or site acquisition within Detroit affected the racial composition of the school population outside Detroit or, conversely, that the State's school construction and site acquisition activities within the outlying districts affected the racial composition of the schools within Detroit.

(5) The Court of Appeals also relied upon the District Court's finding:

> "This and other financial limitations, such as those on bonding and the working of the state aid formula whereby suburban districts were able to make far larger per pupil expenditures despite less tax effort, have created and perpetuated systematic educational inequalities." *Id.,* at 239.

However, neither the Court of Appeals nor the District Court offered any indication in the record or in their opinions as to how, if at all, the availability of state-financed aid for some Michigan students outside Detroit, but not for those within Detroit, might have affected the racial character of any of the State's school districts. Furthermore, as the respondents recognize, the application of our recent ruling in *San Antonio School District* v. *Rodriguez,* 411 U. S. 1 (1973), to this state education financing system is questionable, and this issue was not

addressed by either the Court of Appeals or the District Court. This, again, underscores the crucial fact that the theory upon which the case proceeded related solely to the establishment of Detroit city violations as a basis for desegregating Detroit schools and that, at the time of trial, neither the parties nor the trial judge was concerned with a foundation for interdistrict relief.[24]

## IV

Petitioners have urged that they were denied due process by the manner in which the District Court limited their participation after intervention was allowed, thus precluding adequate opportunity to present evidence that they had committed no acts having a segregative effect in Detroit. In light of our holding that, absent an interdistrict violation, there is no basis for an interdistrict remedy, we need not reach these claims. It is clear, however, that the District Court, with the approval of the Court of Appeals, has provided an interdistrict remedy in the face of a record which shows no constitutional violations that would call for equitable relief except within the city of Detroit. In these circumstances there was no occasion for the parties to address, or for the District Court to consider whether there were racially discriminatory acts for which any of the 53 outlying districts were responsible and which had direct and significant segregative effect on schools of more than one district.

We conclude that the relief ordered by the District Court and affirmed by the Court of Appeals was based upon an erroneous standard and was unsupported by record evidence that acts of the outlying districts effected the discrimination found to exist in the schools of De-

---

[24] Apparently, when the District Court, *sua sponte*, abruptly altered the theory of the case to include the possibility of multidistrict relief, neither the plaintiffs nor the trial judge considered amending the complaint to embrace the new theory.

troit. Accordingly, the judgment of the Court of Appeals is reversed and the case is remanded for further proceedings consistent with this opinion leading to prompt formulation of a decree directed to eliminating the segregation found to exist in Detroit city schools, a remedy which has been delayed since 1970.

*Reversed and remanded.*

MR. JUSTICE STEWART, concurring.

In joining the opinion of the Court, I think it appropriate, in view of some of the extravagant language of the dissenting opinions, to state briefly my understanding of what it is that the Court decides today.

The respondents commenced this suit in 1970, claiming only that a constitutionally impermissible allocation of educational facilities along racial lines had occurred in public schools within a single school district whose lines were coterminous with those of the city of Detroit. In the course of the subsequent proceedings, the District Court found that public school officials had contributed to racial segregation within that district by means of improper use of zoning and attendance patterns, optional-attendance areas, and building and site selection. This finding of a violation of the Equal Protection Clause was upheld by the Court of Appeals, and is accepted by this Court today. See *ante,* at 738 n. 18. In the present posture of the case, therefore, the Court does not deal with questions of substantive constitutional law. The basic issue now before the Court concerns, rather, the appropriate exercise of federal equity jurisdiction.[1]

---

[1] As this Court stated in *Brown* v. *Board of Education,* 349 U. S. 294, 300: "[E]quity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs. These [school desegregation] cases call for the exercise of these traditional attributes of equity power."

No evidence was adduced and no findings were made in the District Court concerning the activities of school officials in districts outside the city of Detroit, and no school officials from the outside districts even participated in the suit until after the District Court had made the initial determination that is the focus of today's decision. In spite of the limited scope of the inquiry and the findings, the District Court concluded that the only effective remedy for the constitutional violations found to have existed within the city of Detroit was a desegregation plan calling for busing pupils to and from school districts outside the city. The District Court found that any desegregation plan operating wholly " 'within the corporate geographical limits of the city' " would be deficient since it " 'would clearly make the entire Detroit public school system racially identifiable as Black.' " 484 F. 2d 215, 244, 243. The Court of Appeals, in affirming the decision that an interdistrict remedy was necessary, noted that a plan limited to the city of Detroit "would result in an all black school system immediately surrounded by practically all white suburban school systems, with an overwhelmingly white majority population in the total metropolitan area." *Id.,* at 245.

The courts were in error for the simple reason that the remedy they thought necessary was not commensurate with the constitutional violation found. Within a single school district whose officials have been shown to have engaged in unconstitutional racial segregation, a remedial decree that affects every individual school may be dictated by "common sense," see *Keyes* v. *School District No. 1, Denver, Colorado,* 413 U. S. 189, 203, and indeed may provide the only effective means to eliminate segregation "root and branch," *Green* v. *County School Board of New Kent County,* 391 U. S. 430, 438, and to "effectuate a transition to a racially nondiscriminatory school

system." *Brown* v. *Board of Education,* 349 U. S. 294, 301. See *Keyes, supra,* at 198–205. But in this case the Court of Appeals approved the concept of a remedial decree that would go beyond the boundaries of the district where the constitutional violation was found, and include schools and schoolchildren in many other school districts that have presumptively been administered in complete accord with the Constitution.

The opinion of the Court convincingly demonstrates, *ante,* at 742–743, that traditions of local control of schools, together with the difficulty of a judicially supervised restructuring of local administration of schools, render improper and inequitable such an interdistrict response to a constitutional violation found to have occurred only within a single school district.

This is not to say, however, that an interdistrict remedy of the sort approved by the Court of Appeals would not be proper, or even necessary, in other factual situations. Were it to be shown, for example, that state officials had contributed to the separation of the races by drawing or redrawing school district lines, see *Haney* v. *County Board of Education of Sevier County,* 429 F. 2d 364; cf. *Wright* v. *Council of the City of Emporia,* 407 U. S. 451; *United States* v. *Scotland Neck Board of Education,* 407 U. S. 484; by transfer of school units between districts, *United States* v. *Texas,* 321 F. Supp. 1043, aff'd, 447 F. 2d 441; *Turner* v. *Warren County Board of Education,* 313 F. Supp. 380; or by purposeful, racially discriminatory use of state housing or zoning laws, then a decree calling for transfer of pupils across district lines or for restructuring of district lines might well be appropriate.

In this case, however, no such interdistrict violation was shown. Indeed, no evidence at all concerning the administration of schools outside the city of Detroit was presented other than the fact that these schools contained

a higher proportion of white pupils than did the schools within the city. Since the mere fact of different racial compositions in contiguous districts does not itself imply or constitute a violation of the Equal Protection Clause in the absence of a showing that such disparity was imposed, fostered, or encouraged by the State or its political subdivisions, it follows that no interdistrict violation was shown in this case.[2] The formulation of an interdistrict remedy was thus simply not responsive to the factual record before the District Court and was an abuse of that court's equitable powers.

---

[2] My Brother MARSHALL seems to ignore this fundamental fact when he states, *post,* at 799, that "the most essential finding [made by the District Court] was that Negro children in Detroit had been confined by intentional acts of segregation to a growing core of Negro schools surrounded by a receding ring of white schools." This conclusion is simply not substantiated by the record presented in this case. The record here does support the claim made by the respondents that white and Negro students within Detroit who otherwise would have attended school together were separated by acts of the State or its subdivision. However, segregative acts within the city alone cannot be presumed to have produced—and no factual showing was made that they did produce—an increase in the number of Negro students *in the city as a whole.* It is this essential fact of a predominantly Negro school population in Detroit—caused by unknown and perhaps unknowable factors such as in-migration, birth rates, economic changes, or cumulative acts of private racial fears—that accounts for the "growing core of Negro schools," a "core" that has grown to include virtually the entire city. The Constitution simply does not allow federal courts to attempt to change that situation unless and until it is shown that the State, or its political subdivisions, have contributed to cause the situation to exist. No record has been made in this case showing that the racial composition of the Detroit school population or that residential patterns within Detroit and in the surrounding areas were in any significant measure caused by governmental activity, and it follows that the situation over which my dissenting Brothers express concern cannot serve as the predicate for the remedy adopted by the District Court and approved by the Court of Appeals.

In reversing the decision of the Court of Appeals this Court is in no way turning its back on the proscription of state-imposed segregation first voiced in *Brown* v. *Board of Education,* 347 U. S. 483, or on the delineation of remedial powers and duties most recently expressed in *Swann* v. *Charlotte-Mecklenburg Board of Education,* 402 U. S: 1. In *Swann* the Court addressed itself to the range of equitable remedies available to the courts to effectuate the desegregation mandated by *Brown* and its progeny, noting that the task in choosing appropriate relief is "to correct . . . the condition that offends the Constitution," and that "the nature of the violation determines the scope of the remedy . . . ." *Id.,* at 16.

The disposition of this case thus falls squarely under these principles. The only "condition that offends the Constitution" found by the District Court in this case is the existence of officially supported segregation in and among public schools in Detroit itself. There were no findings that the differing racial composition between schools in the city and in the outlying suburbs was caused by official activity of any sort. It follows that the decision to include in the desegregation plan pupils from school districts outside Detroit was not predicated upon any constitutional violation involving those school districts. By approving a remedy that would reach beyond the limits of the city of Detroit to correct a constitutional violation found to have occurred solely within that city the Court of Appeals thus went beyond the governing equitable principles established in this Court's decisions.

MR. JUSTICE DOUGLAS, dissenting.

The Court of Appeals has acted responsibly in these cases and we should affirm its judgment. This was the fourth time the case was before it over a span of less than three years. The Court of Appeals affirmed the District

Court on the issue of segregation and on the "Detroit-only" plans of desegregation. The Court of Appeals also approved in principle the use of a metropolitan area plan, vacating and remanding only to allow the other affected school districts to be brought in as parties, and in other minor respects.

We have before us today no plan for integration. The only orders entered so far are interlocutory. No new principles of law are presented here. Metropolitan treatment of metropolitan problems is commonplace. If this were a sewage problem or a water problem, or an energy problem, there can be no doubt that Michigan would stay well within federal constitutional bounds if it sought a metropolitan remedy. In *Bradley* v. *School Board of City of Richmond,* 462 F. 2d 1058, aff'd by an equally divided Court, 412 U. S. 92, we had a case involving the Virginia school system where local school boards had "exclusive jurisdiction" of the problem, not "the State Board of Education," 462 F. 2d, at 1067. Here the Michigan educational system is unitary, maintained and supported by the legislature and under the general supervision of the State Board of Education.[1] The State controls the boundaries of school districts.[2] The State supervises schoolsite selection.[3] The construction is done through municipal bonds approved by several state agencies.[4] Education in Michigan is a state project with very little completely local control,[5] except that the schools are financed locally, not on a statewide basis. Indeed

---

[1] Mich. Const., Art. 8, §§ 2, 3.

[2] See 484 F. 2d 215, 247–248; Mich. Comp. Laws §§ 340.402, 340.431, 340.447, 388.681 (1970).

[3] Mich. Comp. Laws § 388.851 (1948), as amended by Act 231, Mich. Pub. Acts of 1949, and Act 175, Mich. Pub. Acts 1962.

[4] See Mich. Comp. Laws §§ 132.1 and 132.2 (1970); 3 App. 157.

[5] See 484 F. 2d, at 248–249.

the proposal to put school funding in Michigan on a state-wide basis was defeated at the polls in November 1972.[6] Yet the school districts by state law are agencies of the State.[7] State action is indeed challenged as violating the Equal Protection Clause. Whatever the reach of that claim may be, it certainly is aimed at discrimination based on race.

Therefore as the Court of Appeals held there can be no doubt that as a matter of Michigan law the State itself has the final say as to where and how school district lines should be drawn.[8]

When we rule against the metropolitan area remedy we take a step that will likely put the problems of the blacks and our society back to the period that antedated the "separate but equal" regime of *Plessy* v. *Ferguson,* 163 U. S. 537. The reason is simple.

The inner core of Detroit is now rather solidly black;[9] and the blacks, we know, in many instances are likely to

---

[6] See Detroit Free Press, Nov. 8, 1972, p. 1A, col. 3. Michigan has recently passed legislation which could eliminate some, but not all, of the inequities in school financing. See Act 101, Mich. Pub. Acts of 1973.

[7] See 484 F. 2d, at 246–247; Mich. Const. Art. 8, §§ 2, 3.

[8] See n. 2, *supra.*

[9] A tremendous change has occurred in the distribution of this country's black population since World War I. See Hauser, Demographic Factors in the Integration of the Negro, Daedalus 847–877 (fall 1965). In 1910, 73% of all blacks lived on farms and in rural areas; by 1960, 73% lived in urban areas, mainly in the largest metropolitan areas. Moreover, due to the fact that the black population is younger than the white population, the concentration of blacks in the cities is even more pronounced for the school-age population. The pattern of change which has existed since World War I is continuing, and hence the proportion of blacks in the urban North and West will continue to increase. Dept. of Health, Education, and Welfare, J. Coleman et al., Equality of Educational Opportunity 39–40 (1966).

be poorer,[10] just as were the Chicanos in *San Antonio School District* v. *Rodriguez*, 411 U. S. 1. By that decision the poorer school districts [11] must pay their own way. It is therefore a foregone conclusion that we have now given the States a formula whereby the poor must pay their own way.[12]

---

[10] "There are some definite and systematic directions of difference between the schools attended by minorities and those attended by the majority. It appears to be in the most academically related areas that the schools of minority pupils show the most consistent deficiencies." Dept. of Health, Education, and Welfare, Coleman et al., *supra*, n. 9, at 120.

[11] That some school districts are markedly poorer than others is beyond question. The California Supreme Court has noted that per-pupil expenditures in two different districts—both located in the same county—were $2,223 and $616. *Serrano* v. *Priest*, 5 Cal. 3d 584, 600 n. 15, 487 P. 2d 1241, 1252 n. 15 (1971). In New York the Fleischmann Commission reported that the two Long Island districts of Great Neck and Levittown spent $2,078 and $1,189 respectively per pupil. 1 New York State Commission on the Quality, Cost, and Financing of Elementary and Secondary Education, Fleischmann Report 58 (1973). "A further glaring inequity resulting from the current systems of school finance is that variations in per pupil expenditures among school districts tend to be inversely related to educational need. City students, with greater than average educational deficiencies, consistently have less money spent on their education and have higher pupil/teacher ratios than do their high-income counterparts in the favored schools of suburbia." Glickstein & Want, Inequality in School Financing: The Role of the Law, 25 Stan. L. Rev. 335, 338 (1973).

[12] Cities face an especially difficult problem in paying the cost of education, since they have the "municipal overburden" which results from greater costs for health, public safety, sanitation, public works, transportation, public welfare, public housing, and recreation. Because of municipal overburden, cities on the average devote only about 30% of their budgets to their schools. This compares with the over 50% which is spent on schools by the suburbs. J. Berke & J. Callahan, Inequities in School Finance (1971), reprinted in Senate Select Committee on Equal Educational

Today's decision, given *Rodriguez,* means that there is no violation of the Equal Protection Clause though the schools are segregated by race and though the black schools are not only "separate" but "inferior."

So far as equal protection is concerned we are now in a dramatic retreat from the 7-to-1 decision in 1896 that blacks could be segregated in public facilities, provided they received equal treatment.

As I indicated in *Keyes* v. *School District No. 1 Denver, Colorado,* 413 U. S. 189, 214–217, there is so far as the school cases go no constitutional difference between *de facto* and *de jure* segregation. Each school board performs state action for Fourteenth Amendment purposes when it draws the lines that confine it to a given area, when it builds schools at particular sites, or when it allocates students. The creation of the school districts in Metropolitan Detroit either maintained existing segregation or caused additional segregation. Restrictive covenants maintained by state action or inaction build black ghettos. It is state action when public funds are dispensed by housing agencies to build racial ghettos. Where a community is racially mixed and school authorities segregate schools, or assign black teachers to black schools or close schools in fringe areas and build new schools in black areas and in more distant white areas, the State creates and nurtures a segregated school system, just as surely as did those States involved in *Brown* v. *Board of Education,* 347 U. S. 483, when they maintained dual school systems.

All these conditions and more were found by the District Court to exist. The issue is not whether there should be racial balance but whether the State's use of

Opportunity, 92d Cong., 2d Sess., Report on Issues in School Finance 129, 142 (Comm. Print 1972); see Glickstein & Want, *supra,* n. 11, at 387.

various devices that end up with black schools and white schools brought the Equal Protection Clause into effect. Given the State's control over the educational system in Michigan, the fact that the black schools are in one district and the white schools are in another is not controlling—either constitutionally or equitably.[13]   No specific plan has yet been adopted.   We are still at an interlocutory stage of a long drawn-out judicial effort at school desegregation.   It is conceivable that ghettos develop on their own without any hint of state action. But since Michigan by one device or another has over the years created black school districts and white school districts, the task of equity is to provide a unitary system for the affected area where, as here, the State washes its hands of its own creations.

MR. JUSTICE WHITE, with whom MR. JUSTICE DOUGLAS, MR. JUSTICE BRENNAN, and MR. JUSTICE MARSHALL join, dissenting.

The District Court and the Court of Appeals found that over a long period of years those in charge of the Michigan public schools engaged in various practices calculated to effect the segregation of the Detroit school system.   The Court does not question these findings, nor could it reasonably do so.   Neither does it question the obligation of the federal courts to devise a feasible and effective remedy.   But it promptly cripples the ability of the judiciary to perform this task, which is of fundamental importance to our constitutional system, by

---

[13] MR. JUSTICE STEWART indicates that equitable factors weigh in favor of local school control and the avoidance of administrative difficulty given the lack of an "interdistrict" violation.   *Ante,* at 755. It would seem to me that the equities are stronger in favor of the children of Detroit who have been deprived of their constitutional right to equal treatment by the State of Michigan.

fashioning a strict rule that remedies in school cases must stop at the school district line unless certain other conditions are met. As applied here, the remedy for unquestioned violations of the equal protection rights of Detroit's Negroes by the Detroit School Board and the State of Michigan must be totally confined to the limits of the school district and may not reach into adjoining or surrounding districts unless and until it is proved there has been some sort of "interdistrict violation"—unless unconstitutional actions of the Detroit School Board have had a segregative impact on other districts, or unless the segregated condition of the Detroit schools has itself been influenced by segregative practices in those surrounding districts into which it is proposed to extend the remedy.

Regretfully, and for several reasons, I can join neither the Court's judgment nor its opinion. The core of my disagreement is that deliberate acts of segregation and their consequences will go unremedied, not because a remedy would be infeasible or unreasonable in terms of the usual criteria governing school desegregation cases, but because an effective remedy would cause what the Court considers to be undue administrative inconvenience to the State. The result is that the State of Michigan, the entity at which the Fourteenth Amendment is directed, has successfully insulated itself from its duty to provide effective desegregation remedies by vesting sufficient power over its public schools in its local school districts. If this is the case in Michigan, it will be the case in most States.

There are undoubted practical as well as legal limits to the remedial powers of federal courts in school desegregation cases. The Court has made it clear that the achievement of any particular degree of racial balance in the school system is not required by the Constitution;

nor may it be the primary focus of a court in devising an acceptable remedy for *de jure* segregation. A variety of procedures and techniques are available to a district court engrossed in fashioning remedies in a case such as this; but the courts must keep in mind that they are dealing with the process of *educating* the young, including the very young. The task is not to devise a system of pains and penalties to punish constitutional violations brought to light. Rather, it is to desegregate an *educational* system in which the races have been kept apart, without, at the same time, losing sight of the central *educational* function of the schools.

Viewed in this light, remedies calling for school zoning, pairing, and pupil assignments, become more and more suspect as they require that schoolchildren spend more and more time in buses going to and from school and that more and more educational dollars be diverted to transportation systems. Manifestly, these considerations are of immediate and urgent concern when the issue is the desegregation of a city school system where residential patterns are predominantly segregated and the respective areas occupied by blacks and whites are heavily populated and geographically extensive. Thus, if one postulates a metropolitan school system covering a sufficiently large area, with the population evenly divided between whites and Negroes and with the races occupying identifiable residential areas, there will be very real practical limits on the extent to which racially identifiable schools can be eliminated within the school district. It is also apparent that the larger the proportion of Negroes in the area, the more difficult it would be to avoid having a substantial number of all-black or nearly all-black schools.

The Detroit school district is both large and heavily populated. It covers 139.6 square miles, encircles two

entirely separate cities and school districts, and surrounds a third city on three sides. Also, whites and Negroes live in identifiable areas in the city. The 1970 public school enrollment in the city school district totaled 289,763 and was 63.6% Negro and 34.8% white.[1] If "racial balance" were achieved in every school in the district, each school would be approximately 64% Negro. A remedy confined to the district could achieve no more desegregation. Furthermore, the proposed intracity remedies were beset with practical problems. None of the plans limited to the school district was satisfactory to the District Court. The most promising proposal, submitted by respondents, who were the plaintiffs in the District Court, would "leave many of its schools 75 to 90 per cent Black." 484 F. 2d 215, 244 (CA6 1973).[2] Transportation on a "vast scale" would be required; 900 buses would have to be purchased for the transportation of pupils who are not now bused. *Id.*, at 243. The District Court also found that the plan "would change a school system which is now Black and White to one that would be perceived as Black, thereby increasing the flight of Whites from the city and the system, thereby increasing the Black student population." *Id.*, at 244. For the District Court, "[t]he conclusion, under the evidence in this case, is inescapable that relief of segregation in the public schools of the

---

[1] The percentage of Negro pupils in the Detroit student population rose to 64.9% in 1971, to 67.3% in 1972, and to 69.8% in 1973, amid a metropolitan school population whose racial composition in 1970 was 81% white and 19% Negro. 5 App. 16; Racial-Ethnic Distribution of Students and Employees in the Detroit Public Schools, October 1972, and October 1973; 484 F. 2d 215, 250.

[2] The District Court's ruling on the Detroit-only desegregation plans is set out in full by the Court of Appeals, *id.*, at 242–245, and is not otherwise officially reported.

City of Detroit cannot be accomplished within the corporate geographical limits of the city." *Ibid.*

The District Court therefore considered extending its remedy to the suburbs. After hearings, it concluded that a much more effective desegregation plan could be implemented if the suburban districts were included. In proceeding to design its plan on the basis that student bus rides to and from school should not exceed 40 minutes each way as a general matter, the court's express finding was that "[f]or all the reasons stated heretofore—including time, distance, and transportation factors—desegregation within the area described is physically easier and more practicable and feasible, than desegregation efforts limited to the corporate geographic limits of the city of Detroit." 345 F. Supp. 914, 930 (ED Mich. 1972).

The Court of Appeals agreed with the District Court that the remedy must extend beyond the city limits of Detroit. It concluded that "[i]n the instant case the *only* feasible desegregation plan involves the crossing of the boundary lines between the Detroit School District and adjacent or nearby school districts for the limited purpose of providing an effective desegregation plan." 484 F. 2d, at 249. (Emphasis added.) It also agreed that "any Detroit only desegregation plan will lead directly to a single segregated Detroit school district overwhelmingly black in all of its schools, surrounded by a ring of suburbs and suburban school districts overwhelmingly white in composition in a State in which the racial composition is 87 per cent white and 13 per cent black." *Ibid.* There was "more than ample support for the District Judge's findings of unconstitutional segregation by race resulting in major part from action and inaction of public authorities, both local and State. . . . Under this record a remedial order of a court of equity which left the Detroit school system overwhelmingly black (for the fore-

seeable future) surrounded by suburban school systems overwhelmingly white cannot correct the constitutional violations herein found." *Id.*, at 250. To conclude otherwise, the Court of Appeals announced, would call up "haunting memories of the now long overruled and discredited 'separate but equal doctrine' of Plessy v. Ferguson, 163 U. S. 537 . . . (1896)," and "would be opening a way to nullify Brown v. Board of Education which overruled *Plessy* . . . ." 484 F. 2d, at 249.

This Court now reverses the Court of Appeals. It does not question the District Court's findings that *any* feasible Detroit-only plan would leave many schools 75 to 90 percent black and that the district would become progressively more black as whites left the city. Neither does the Court suggest that including the suburbs in a desegregation plan would be impractical or infeasible because of educational considerations, because of the number of children requiring transportation, or because of the length of their rides. Indeed, the Court leaves unchallenged the District Court's conclusion that a plan including the suburbs would be physically easier and more practical and feasible than a Detroit-only plan. Whereas the most promising Detroit-only plan, for example, would have entailed the purchase of 900 buses, the metropolitan plan would involve the acquisition of no more than 350 new vehicles.

Despite the fact that a metropolitan remedy, if the findings of the District Court accepted by the Court of Appeals are to be credited, would more effectively desegregate the Detroit schools, would prevent resegregation,[3] and would be easier and more feasible from many

---

[3] The Court has previously disapproved the implementation of proposed desegregation plans which operate to permit resegregation. *Monroe* v. *Board of Comm'rs*, 391 U. S. 450, 459–460 (1968) ("free transfer" plan).

standpoints, the Court fashions out of whole cloth an arbitrary rule that remedies for constitutional violations occurring in a single Michigan school district must stop at the school district line. Apparently, no matter how much less burdensome or more effective and efficient in many respects, such as transportation, the metropolitan plan might be, the school district line may not be crossed. Otherwise, it seems, there would be too much disruption of the Michigan scheme for managing its educational system, too much confusion, and too much administrative burden.

The District Court, on the scene and familiar with local conditions, had a wholly different view. The Court of Appeals also addressed itself at length to matters of local law and to the problems that interdistrict remedies might present to the State of Michigan. Its conclusion, flatly contrary to that of this Court, was that "the constitutional right to equality before the law [is not] hemmed in by the boundaries of a school district" and that an interdistrict remedy

"is supported by the status of school districts under Michigan law and by the historical control exercised over local school districts by the legislature of Michigan and by State agencies and officials . . . . [I]t is well established under the Constitution and laws of Michigan that the public school system is a State function and that local school districts are instrumentalities of the State created for administrative convenience." [4]  484 F. 2d, at 245–246.

---

[4] The Court of Appeals also noted several specific instances of school district mergers ordered by the State Board of Education for financial reasons. 484 F. 2d, at 247. Limitations on the authority of local school districts were also outlined by the Court of Appeals:

"Local school districts, unless they have the approval of the State Board of Education or the Superintendent of Public Instruction, can-

I am surprised that the Court, sitting at this distance from the State of Michigan, claims better insight than the Court of Appeals and the District Court as to whether an interdistrict remedy for equal protection violations practiced by the State of Michigan would involve undue difficulties for the State in the management of its public schools.  In the area of what constitutes an acceptable desegregation plan, "we must of necessity rely to a large extent, as this Court has for more than 16 years, on the informed judgment of the district courts in the first instance and on courts of appeals." *Swann* v. *Charlotte-Mecklenburg Board of Education,* 402 U. S. 1, 28 (1971).  Obviously, whatever difficulties there might be, they are surmountable; for the Court itself concedes that, had there been sufficient evidence of an interdistrict violation, the District Court could have fashioned a single remedy for the districts implicated rather than a different remedy for each district

---

not consolidate with another school district, annex territory, divide or attach parts of other districts, borrow monies in anticipation of State aid, or construct, reconstruct or remodel school buildings or additions to them." *Id.,* at 249.  (Footnotes and supporting statutory citations omitted.)

And the Court of Appeals properly considered the State's statutory attempt to undo the adoption of a voluntary high school desegregation plan by the Detroit Board of Education as evidencing state control over local school district affairs. *Ibid.* Finally, it is also relevant to note that the District Court found that the school district boundaries in that segment of the metropolitan area preliminarily designated as the desegregation area "in general bear no relationship to other municipal, county, or special district governments, needs or services," that some educational services are already provided to students on an interdistrict basis requiring their travel from one district to another, and that local communities in the metropolitan area share noneducational interests in common, which do not adhere to school district lines, and have applied metropolitan solutions to other governmental needs.  345 F. Supp. 914, 934–935 (ED Mich. 1972).

in which the violation had occurred or had an impact.

I am even more mystified as to how the Court can ignore the legal reality that the constitutional violations, even if occurring locally, were committed by governmental entities for which the State is responsible and that it is the State that must respond to the command of the Fourteenth Amendment. An interdistrict remedy for the infringements that occurred in this case is well within the confines and powers of the State, which is the governmental entity ultimately responsible for desegregating its schools. The Michigan Supreme Court has observed that "[t]he school district is a State agency," *Attorney General ex rel. Kies* v. *Lowrey,* 131 Mich. 639, 644, 92 N. W. 289, 290 (1902), and that " '[e]ducation in Michigan belongs to the State. It is no part of the local self-government inherent in the township or municipality, except so far as the legislature may choose to make it such. The Constitution has turned the whole subject over to the legislature. . . .' " *Attorney General ex rel. Zacharias* v. *Detroit Board of Education,* 154 Mich. 584, 590, 118 N. W. 606, 609 (1908).

It is unnecessary to catalogue at length the various public misdeeds found by the District Court and the Court of Appeals to have contributed to the present segregation of the Detroit public schools. The legislature contributed directly by enacting a statute overriding a partial high school desegregation plan voluntarily adopted by the Detroit Board of Education. Indirectly, the trial court found the State was accountable for the thinly disguised, pervasive acts of segregation committed by the Detroit Board,[5] for Detroit's school construction

---

[5] These included the creation and alteration of attendance zones and feeder patterns from the elementary to the secondary schools in a manner naturally and predictably perpetuating racial segregation of students, the transportation of Negro students beyond predomi-

plans that would promote segregation, and for the Detroit school district's not having funds for pupil transportation within the district. The State was also chargeable with responsibility for the transportation of Negro high school students in the late 1950's from the suburban Ferndale School District, past closer suburban and Detroit high schools with predominantly white student bodies, to a predominantly Negro high school within Detroit. *Swann* v. *Charlotte-Mecklenburg Board of Education, supra,* at 20–21, and *Keyes* v. *School District No. 1, Denver, Colorado,* 413 U. S. 189 (1973), make abundantly clear that the tactics employed by the Detroit Board of Education, a local instrumentality of the State, violated the constitutional rights of the Negro students in Detroit's public schools and required equitable relief sufficient to accomplish the maximum, practical desegregation within the power of the political body against which the Fourteenth Amendment directs its proscriptions. No "State" may deny any individual the equal protection of the laws; and if the Constitution and the Supremacy Clause are to have any substance at all, the courts must be free to devise workable remedies against the political entity with the effective power to determine local choice. It is also the case here that the State's legislative interdiction of Detroit's voluntary effort to desegregate its school system was unconstitutional. See *North Carolina State Board of Education* v. *Swann,* 402 U. S. 43 (1971).

The Court draws the remedial line at the Detroit school district boundary, even though the Fourteenth Amendment is addressed to the State and even though

---

nantly white schools with available space to predominantly Negro schools, the use of optional attendance areas in neighborhoods in which Negro families had recently begun to settle to permit white students to transfer to predominantly white schools nearer the city limits, and the construction of schools in the heart of residentially segregated areas, thereby maximizing school segregation.

the *State* denies equal protection of the laws when its public agencies, acting in its behalf, invidiously discriminate. The State's default is "the condition that offends the Constitution," *Swann* v. *Charlotte-Mecklenburg Board of Education, supra,* at 16, and state officials may therefore be ordered to take the necessary measures to completely eliminate from the Detroit public schools "all vestiges of state-imposed segregation." *Id.,* at 15. I cannot understand, nor does the majority satisfactorily explain, why a federal court may not order an appropriate interdistrict remedy, if this is necessary or more effective to accomplish this constitutionally mandated task. As the Court unanimously observed in *Swann:* "Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Ibid.* In this case, both the right and the State's Fourteenth Amendment violation have concededly been fully established, and there is no acceptable reason for permitting the party responsible for the constitutional violation to contain the remedial powers of the federal court within administrative boundaries over which the transgressor itself has plenary power.

The unwavering decisions of this Court over the past 20 years support the assumption of the Court of Appeals that the District Court's remedial power does not cease at the school district line. The Court's first formulation of the remedial principles to be followed in disestablishing racially discriminatory school systems recognized the variety of problems arising from different local school conditions and the necessity for that "practical flexibility" traditionally associated with courts of equity. *Brown* v. *Board of Education,* 349 U. S. 294, 299–301 (1955) (*Brown II*). Indeed, the district courts to which

the *Brown* cases were remanded for the formulation of remedial decrees were specifically instructed that they might consider, *inter alia,* "revision of school districts and attendance areas into compact units to achieve a system of determining admission to the public schools on a nonracial basis . . . ." *Id.,* at 300–301. The malady addressed in *Brown II* was the statewide policy of requiring or permitting school segregation on the basis of race, while the record here concerns segregated schools only in the city of Detroit. The obligation to rectify the unlawful condition nevertheless rests on the State. The permissible revision of school districts contemplated in *Brown II* rested on the State's responsibility for desegregating its unlawfully segregated schools, not on any segregative effect which the condition of segregation in one school district might have had on the schools of a neighboring district. The same situation obtains here and the same remedial power is available to the District Court.

Later cases reinforced the clearly essential rules that state officials are fully answerable for unlawfully caused conditions of school segregation which can effectively be controlled only by steps beyond the authority of local school districts to take, and that the equity power of the district courts includes the ability to order such measures implemented. When the highest officials of the State of Arkansas impeded a federal court order to desegregate the public schools under the immediate jurisdiction of the Little Rock School Board, this Court refused to accept the local board's assertion of its good faith as a legal excuse for delay in implementing the desegregation order. The Court emphasized that "from the point of view of the Fourteenth Amendment, they [the local school board members] stand in this litigation as the agents of the State." *Cooper* v. *Aaron,* 358 U. S. 1, 16 (1958). Per-

haps more importantly for present purposes, the Court went on to state:

> "The record before us clearly establishes that the growth of the Board's difficulties to a magnitude beyond its unaided power to control is the product of state action. Those difficulties . . . can also be brought under control by state action." *Ibid.*

See also *Griffin* v. *School Board,* 377 U. S. 218, 228, 233–234 (1964).

In the context of dual school systems, the Court subsequently made clear the "affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch" and to come forward with a desegregation plan that "promises realistically to work *now.*" *Green* v. *County School Board of New Kent County,* 391 U. S. 430, 437–438, 439 (1968). "Freedom of choice" plans were rejected as acceptable desegregation measures where "reasonably available other ways . . . promising speedier and more effective conversion to a unitary, nonracial school system . . ." exist. *Id.,* at 441. Imperative insistence on immediate full desegregation of dual school systems "to operate now and hereafter only unitary schools" was reiterated in *Alexander* v. *Holmes County Board of Education,* 396 U. S. 19, 20 (1969), and *Carter* v. *West Feliciana Parish School Board,* 396 U. S. 290 (1970).

The breadth of the equitable authority of the district courts to accomplish these comprehensive tasks was reaffirmed in much greater detail in *Swann* v. *Charlotte-Mecklenburg Board of Education, supra,* and the companion case of *Davis* v. *School Comm'rs of Mobile County,* 402 U. S. 33 (1971), where there was unanimous assent to the following propositions:

> "Having once found a violation, the district judge or school authorities should make every effort to

achieve the greatest possible degree of actual de-
segregation, taking into account the practicalities of
the situation. A district court may and should
consider the use of all available techniques includ-
ing restructuring of attendance zones and both
contiguous and noncontiguous attendance zones. . . .
The measure of any desegregation plan is its effec-
tiveness." *Id.*, at 37.

No suggestion was made that interdistrict relief was
not an available technique. In *Swann* v. *Charlotte-
Mecklenburg Board of Education* itself, the Court, with-
out dissent, recognized that the District Judge, in ful-
filling his obligation to "make every effort to achieve the
greatest possible degree of actual desegregation[,] will
thus necessarily be concerned with the elimination of
one-race schools." 402 U. S., at 26. Nor was there any
dispute that to break up the dual school system, it was
within the District Court's "broad remedial powers" to
employ a "frank—and sometimes drastic—gerrymander-
ing of school districts and attendance zones," as well as
"pairing, 'clustering,' or 'grouping' of schools," to de-
segregate the "formerly all-Negro schools," despite the
fact that these zones might not be compact or contiguous
and might be "on opposite ends of the city." *Id.*, at 27.
The school board in that case had jurisdiction over a 550-
square-mile area encompassing the city of Charlotte and
surrounding Mecklenburg County, North Carolina. The
Mobile County, Alabama, board in *Davis* embraced a
1,248-square-mile area, including the city of Mobile.
Yet the Court approved the District Court's authority to
award countywide relief in each case in order to ac-
complish desegregation of the dual school system.

Even more recently, the Court specifically rejected the
claim that a new school district, which admittedly would
operate a unitary school system within its borders, was
beyond the reach of a court-ordered desegregation plan

for other school districts, where the effectiveness of the plan as to the other districts depended upon the availability of the facilities and student population of the new district. In *Wright* v. *Council of the City of Emporia,* 407 U. S. 451, 470 (1972), we held "that a new school district may not be created where its effect would be to impede the process of dismantling a dual system." MR. JUSTICE STEWART's opinion for the Court made clear that if a proposal to erect new district boundary lines "would impede the dismantling of the [pre-existing] dual system, then a district court, in the exercise of its remedial discretion, may enjoin it from being carried out." *Id.,* at 460. In *United States* v. *Scotland Neck Board of Education,* 407 U. S. 484 (1972), this same standard was applied to forbid North Carolina from creating a new city school district within a larger district which was in the process of dismantling a dual school system. The Court noted that if establishment of the new district were permitted, the "traditional racial identities of the schools in the area would be maintained," *id.,* at 490.

Until today, the permissible contours of the equitable authority of the district courts to remedy the unlawful establishment of a dual school system have been extensive, adaptable, and fully responsive to the ultimate goal of achieving "the greatest possible degree of actual desegregation." There are indeed limitations on the equity powers of the federal judiciary, but until now the Court has not accepted the proposition that effective enforcement of the Fourteenth Amendment could be limited by political or administrative boundary lines demarcated by the very State responsible for the constitutional violation and for the disestablishment of the dual system. Until now the Court has instead looked to practical considerations in effectuating a desegregation

decree such as excessive distance, transportation time, and hazards to the safety of the schoolchildren involved in a proposed plan. That these broad principles have developed in the context of dual school systems compelled or authorized by state statute at the time of *Brown* v. *Board of Education,* 347 U. S. 483 (1954) (*Brown I*), does not lessen their current applicability to dual systems found to exist in other contexts, like that in Detroit, where intentional school segregation does not stem from the compulsion of state law, but from deliberate individual actions of local and state school authorities directed at a particular school system. The majority properly does not suggest that the duty to eradicate completely the resulting dual system in the latter context is any less than in the former. But its reason for incapacitating the remedial authority of the federal judiciary in the presence of school district perimeters in the latter context is not readily apparent.

The result reached by the Court certainly cannot be supported by the theory that the configuration of local governmental units is immune from alteration when necessary to redress constitutional violations. In addition to the well-established principles already noted, the Court has elsewhere required the public bodies of a State to restructure the State's political subdivisions to remedy infringements of the constitutional rights of certain members of its populace, notably in the reapportionment cases. In *Reynolds* v. *Sims,* 377 U. S. 533 (1964), for example, which held that equal protection of the laws demands that the seats in both houses of a bicameral state legislature be apportioned on a population basis, thus necessitating wholesale revision of Alabama's voting districts, the Court remarked:

> "Political subdivisions of States—counties, cities, or whatever—never were and never have been con-

sidered as sovereign entities. Rather, they have been traditionally regarded as subordinate governmental instrumentalities created by the State to assist in the carrying out of state governmental functions." *Id.,* at 575.

And even more pointedly, the Court declared in *Gomillion* v. *Lightfoot,* 364 U. S. 339, 344–345 (1960), that "[l]egislative control of municipalities, no less than other state power, lies within the scope of relevant limitations imposed by the United States Constitution."

Nor does the Court's conclusion follow from the talismanic invocation of the desirability of local control over education. Local autonomy over school affairs, in the sense of the community's participation in the decisions affecting the education of its children, is, of course, an important interest. But presently constituted school district lines do not delimit fixed and unchangeable areas of a local educational community. If restructuring is required to meet constitutional requirements, local authority may simply be redefined in terms of whatever configuration is adopted, with the parents of the children attending schools in the newly demarcated district or attendance zone continuing their participation in the policy management of the schools with which they are concerned most directly. The majority's suggestion that judges should not attempt to grapple with the administrative problems attendant on a reorganization of school attendance patterns is wholly without foundation. It is precisely this sort of task which the district courts have been properly exercising to vindicate the constitutional rights of Negro students since *Brown I* and which the Court has never suggested they lack the capacity to perform. Intradistrict revisions of attendance zones, and pairing and grouping of schools, are techniques unanimously approved in *Swann* v. *Charlotte-Mecklenburg*

*Board of Education* which entail the same sensitivity to the interest of parents in the education their children receive as would an interdistrict plan which is likely to employ the very same methods. There is no reason to suppose that the District Court, which has not yet adopted a final plan of desegregation, would not be as capable of giving or as likely to give sufficient weight to the interest in community participation in schools in an interdistrict setting, consistent with the dictates of the Fourteenth Amendment. The majority's assumption that the District Court would act otherwise is a radical departure from the practical flexibility previously left to the equity powers of the federal judiciary.

Finally, I remain wholly unpersuaded by the Court's assertion that "the remedy is necessarily designed, as all remedies are, to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct." *Ante,* at 746. In the first place, under this premise the Court's judgment is itself infirm; for had the Detroit school system not followed an official policy of segregation throughout the 1950's and 1960's, Negroes and whites would have been going to school together. There would have been no, or at least not as many, recognizable Negro schools and no, or at least not as many, white schools, but "just schools," and neither Negroes nor whites would have suffered from the effects of segregated education, with all its shortcomings. Surely the Court's remedy will not restore to the Negro community, stigmatized as it was by the dual school system, what it would have enjoyed over all or most of this period if the remedy is confined to present-day Detroit; for the maximum remedy available within that area will leave many of the schools almost totally black, and the system itself will be predominantly black and will become increasingly so. Moreover, when a State has engaged in acts of official segregation over a lengthy

period of time, as in the case before us, it is unrealistic to suppose that the children who were victims of the State's unconstitutional conduct could now be provided the benefits of which they were wrongfully deprived. Nor can the benefits which accrue to school systems in which schoolchildren have not been officially segregated, and to the communities supporting such school systems, be fully and immediately restored after a substantial period of unlawful segregation. The education of children of different races in a desegregated environment has unhappily been lost, along with the social, economic, and political advantages which accompany a desegregated school system as compared with an unconstitutionally segregated system. It is for these reasons that the Court has consistently followed the course of requiring the effects of past official segregation to be eliminated "root and branch" by imposing, in the present, the duty to provide a remedy which will achieve "the greatest possible degree of actual desegregation, taking into account the practicalities of the situation." It is also for these reasons that once a constitutional violation has been found, the district judge obligated to provide such a remedy "will thus necessarily be concerned with the elimination of one-race schools." These concerns were properly taken into account by the District Judge in this case. Confining the remedy to the boundaries of the Detroit district is quite unrelated either to the goal of achieving maximum desegregation or to those intensely practical considerations, such as the extent and expense of transportation, that have imposed limits on remedies in cases such as this. The Court's remedy, in the end, is essentially arbitrary and will leave serious violations of the Constitution substantially unremedied.

I agree with my Brother Douglas that the Court of Appeals has acted responsibly in these cases. Regret-

tably, the majority's arbitrary limitation on the equitable power of federal district courts, based on the invisible borders of local school districts, is unrelated to the State's responsibility for remedying the constitutional wrongs visited upon the Negro schoolchildren of Detroit. It is oblivious to the potential benefits of metropolitan relief, to the noneducational communities of interest among neighborhoods located in and sometimes bridging different school districts, and to the considerable interdistrict cooperation already existing in various educational areas. Ultimately, it is unresponsive to the goal of attaining the utmost actual desegregation consistent with restraints of practicability and thus augurs the frequent frustration of the remedial powers of the federal courts.

Here the District Court will be forced to impose an intracity desegregation plan more expensive to the district, more burdensome for many of Detroit's Negro students, and surely more conducive to white flight than a metropolitan plan would be—all of this merely to avoid what the Detroit School Board, the District Court, and the en banc Court of Appeals considered to be the very manageable and quite surmountable difficulties that would be involved in extending the desegregation remedy to the suburban school districts.

I am therefore constrained to record my disagreement and dissent.

MR. JUSTICE MARSHALL, with whom MR. JUSTICE DOUGLAS, MR. JUSTICE BRENNAN, and MR. JUSTICE WHITE join, dissenting.

In *Brown* v. *Board of Education,* 347 U. S. 483 (1954), this Court held that segregation of children in public schools on the basis of race deprives minority group children of equal educational opportunities and therefore denies them the equal protection of the laws under the

Fourteenth Amendment. This Court recognized then that remedying decades of segregation in public education would not be an easy task. Subsequent events, unfortunately, have seen that prediction bear bitter fruit. But however imbedded old ways, however ingrained old prejudices, this Court has not been diverted from its appointed task of making "a living truth" of our constitutional ideal of equal justice under law. *Cooper* v. *Aaron,* 358 U. S. 1, 20 (1958).

After 20 years of small, often difficult steps toward that great end, the Court today takes a giant step backwards. Notwithstanding a record showing widespread and pervasive racial segregation in the educational system provided by the State of Michigan for children in Detroit, this Court holds that the District Court was powerless to require the State to remedy its constitutional violation in any meaningful fashion. Ironically purporting to base its result on the principle that the scope of the remedy in a desegregation case should be determined by the nature and the extent of the constitutional violation, the Court's answer is to provide no remedy at all for the violation proved in this case, thereby guaranteeing that Negro children in Detroit will receive the same separate and inherently unequal education in the future as they have been unconstitutionally afforded in the past.

I cannot subscribe to this emasculation of our constitutional guarantee of equal protection of the laws and must respectfully dissent. Our precedents, in my view, firmly establish that where, as here, state-imposed segregation has been demonstrated, it becomes the duty of the State to eliminate root and branch all vestiges of racial discrimination and to achieve the greatest possible degree of actual desegregation. I agree with both the District Court and the Court of Appeals that, under the facts of this case, this duty cannot be fulfilled unless the State

of Michigan involves outlying metropolitan area school districts in its desegregation remedy. Furthermore, I perceive no basis either in law or in the practicalities of the situation justifying the State's interposition of school district boundaries as absolute barriers to the implementation of an effective desegregation remedy. Under established and frequently used Michigan procedures, school district lines are both flexible and permeable for a wide variety of purposes, and there is no reason why they must now stand in the way of meaningful desegregation relief.

The rights at issue in this case are too fundamental to be abridged on grounds as superficial as those relied on by the majority today. We deal here with the right of all of our children, whatever their race, to an equal start in life and to an equal opportunity to reach their full potential as citizens. Those children who have been denied that right in the past deserve better than to see fences thrown up to deny them that right in the future. Our Nation, I fear, will be ill served by the Court's refusal to remedy separate and unequal education, for unless our children begin to learn together, there is little hope that our people will ever learn to live together.

## I

The great irony of the Court's opinion and, in my view, its most serious analytical flaw may be gleaned from its concluding sentence, in which the Court remands for "prompt formulation of a decree directed to eliminating the segregation found to exist in Detroit city schools, a remedy which has been delayed since 1970." *Ante,* at 753. The majority, however, seems to have forgotten the District Court's explicit finding that a Detroit-only decree, the only remedy permitted under today's decision, "would not accomplish desegregation."

Nowhere in the Court's opinion does the majority confront, let alone respond to, the District Court's conclusion that a remedy limited to the city of Detroit would not effectively desegregate the Detroit city schools. I, for one, find the District Court's conclusion well supported by the record and its analysis compelled by our prior cases. Before turning to these questions, however, it is best to begin by laying to rest some mischaracterizations in the Court's opinion with respect to the basis for the District Court's decision to impose a metropolitan remedy.

The Court maintains that while the initial focus of this lawsuit was the condition of segregation within the Detroit city schools, the District Court abruptly shifted focus in mid-course and altered its theory of the case. This new theory, in the majority's words, was "equating racial imbalance with a constitutional violation calling for a remedy." *Ante,* at 741 n. 19. As the following review of the District Court's handling of the case demonstrates, however, the majority's characterization is totally inaccurate. Nowhere did the District Court indicate that racial imbalance between school districts in the Detroit metropolitan area or within the Detroit School District constituted a constitutional violation calling for interdistrict relief. The focus of this case was from the beginning, and has remained, the segregated system of education in the Detroit city schools and the steps necessary to cure that condition which offends the Fourteenth Amendment.

The District Court's consideration of this case began with its finding, which the majority accepts, that the State of Michigan, through its instrumentality, the Detroit Board of Education, engaged in widespread purposeful acts of racial segregation in the Detroit School District. Without belaboring the details, it is sufficient to

note that the various techniques used in Detroit were typical of methods employed to segregate students by race in areas where no statutory dual system of education has existed. See, *e. g., Keyes* v. *School District No. 1, Denver, Colorado,* 413 U. S. 189 (1973). Exacerbating the effects of extensive residential segregation between Negroes and whites, the school board consciously drew attendance zones along lines which maximized the segregation of the races in schools as well. Optional attendance zones were created for neighborhoods undergoing racial transition so as to allow whites in these areas to escape integration. Negro students in areas with overcrowded schools were transported past or away from closer white schools with available space to more distant Negro schools. Grade structures and feeder-school patterns were created and maintained in a manner which had the foreseeable and actual effect of keeping Negro and white pupils in separate schools. Schools were also constructed in locations and in sizes which ensured that they would open with predominantly one-race student bodies. In sum, the evidence adduced below showed that Negro children had been intentionally confined to an expanding core of virtually all-Negro schools immediately surrounded by a receding band of all-white schools.

Contrary to the suggestions in the Court's opinion, the basis for affording a desegregation remedy in this case was not some perceived racial imbalance either between schools within a single school district or between independent school districts. What we confront here is "a systematic program of segregation affecting a substantial portion of the students, schools . . . and facilities within the school system . . . ." *Id.,* at 201. The constitutional violation found here was not some *de facto* racial imbalance, but rather the purposeful, intentional, massive, *de jure* segregation of the Detroit city schools,

which under our decision in *Keyes,* forms "a predicate for a finding of the existence of a dual school system," *ibid.,* and justifies "all-out desegregation." *Id.,* at 214.

Having found a *de jure* segregated public school system in operation in the city of Detroit, the District Court turned next to consider which officials and agencies should be assigned the affirmative obligation to cure the constitutional violation. The court concluded that responsibility for the segregation in the Detroit city schools rested not only with the Detroit Board of Education, but belonged to the State of Michigan itself and the state defendants in this case—that is, the Governor of Michigan, the Attorney General, the State Board of Education, and the State Superintendent of Public Instruction. While the validity of this conclusion will merit more extensive analysis below, suffice it for now to say that it was based on three considerations. First, the evidence at trial showed that the State itself had taken actions contributing to the segregation within the Detroit schools. Second, since the Detroit Board of Education was an agency of the State of Michigan, its acts of racial discrimination were acts of the State for purposes of the Fourteenth Amendment. Finally, the District Court found that under Michigan law and practice, the system of education was in fact a *state* school system, characterized by relatively little local control and a large degree of centralized state regulation, with respect to both educational policy and the structure and operation of school districts.

Having concluded, then, that the school system in the city of Detroit was a *de jure* segregated system and that the State of Michigan had the affirmative duty to remedy that condition of segregation, the District Court then turned to the difficult task of devising an effective remedy. It bears repeating that the District Court's focus at this stage of the litigation remained what it had

been at the beginning—the condition of segregation within the Detroit city schools. As the District Court stated: "From the initial ruling [on segregation] to this day, the basis of the proceedings has been and remains the violation: de jure school segregation. . . . The task before this court, therefore, is now, and . . . has always been, how to desegregate the Detroit public schools."

The District Court first considered three desegregation plans limited to the geographical boundaries of the city of Detroit. All were rejected as ineffective to desegregate the Detroit city schools. Specifically, the District Court determined that the racial composition of the Detroit student body is such that implementation of any Detroit-only plan "would clearly make the entire Detroit public school system racially identifiable as Black" and would "leave many of its schools 75 to 90 per cent Black." The District Court also found that a Detroit-only plan "would change a school system which is now Black and White to one that would be perceived as Black, thereby increasing the flight of Whites from the city and the system, thereby increasing the Black student population." Based on these findings, the District Court reasoned that "relief of segregation in the public schools of the City of Detroit cannot be accomplished within the corporate geographical limits of the city" because a Detroit-only decree "would accentuate the racial identifiability of the district as a Black school system, and would not accomplish desegregation." The District Court therefore concluded that it "must look beyond the limits of the Detroit school district for a solution to the problem of segregation in the Detroit public schools . . . ."

In seeking to define the appropriate scope of that expanded desegregation area, however, the District Court continued to maintain as its sole focus the condition shown to violate the Constitution in this case—the segregation of the Detroit school system. As it stated, the

primary question "remains the determination of the area necessary and practicable effectively to eliminate 'root and branch' the effects of state-imposed and supported segregation and to desegregate the Detroit public schools."

There is simply no foundation in the record, then, for the majority's accusation that the only basis for the District Court's order was some desire to achieve a racial balance in the Detroit metropolitan area.[1]  In fact, just the contrary is the case.  In considering proposed desegregation areas, the District Court had occasion to criticize one of the State's proposals specifically because it had no basis other than its "particular racial ratio" and did not focus on "relevant factors, like eliminating racially identifiable schools [and] accomplishing maximum actual desegregation of the Detroit public schools." Similarly, in rejecting the Detroit School Board's proposed desegregation area, even though it included more all-white districts and therefore achieved a higher white-Negro ratio, the District Court commented:

> "There is nothing in the record which suggests that these districts need be included in the desegregation area in order to disestablish the racial

---

[1] Contrary to the Court's characterization, the use of racial ratios in this case in no way differed from that in *Swann* v. *Charlotte-Mecklenburg Board of Education*, 402 U. S. 1 (1971). Here, as there, mathematical ratios were used simply as "a starting point in the process of shaping a remedy, rather than an inflexible requirement." *Id.*, at 25. It may be expected that a final desegregation plan in this case would deviate from a pure mathematical approach.  Indeed, the District Court's most recent order appointing a panel of experts to draft an interdistrict plan requires only that the plan be designed "to achieve the greatest degree of actual desegregation . . . [w]ithin the limitations of reasonable travel time and distance factors." 345 F. Supp. 914, 918 (ED Mich. 1972).  Cf. 402 U. S., at 23.

identifiability of the Detroit public schools. From the evidence, the primary reason for the Detroit School Board's interest in the inclusion of these school districts is not racial desegregation but to increase the average socio-economic balance of all the schools in the abutting regions and clusters."

The Court also misstates the basis for the District Court's order by suggesting that since the only segregation proved at trial was within the Detroit school system, any relief which extended beyond the jurisdiction of the Detroit Board of Education would be inappropriate because it would impose a remedy on outlying districts "not shown to have committed any constitutional violation." *Ante,* at 745.[2] The essential foundation of interdistrict relief in this case was not to correct conditions within outlying districts which themselves engaged in purposeful segregation. Instead, interdistrict relief was seen as a necessary part of any meaningful effort by the State of Michigan to remedy the state-caused segregation within the city of Detroit.

Rather than consider the propriety of interdistrict relief on this basis, however, the Court has conjured up a largely fictional account of what the District Court was attempting to accomplish. With all due respect, the Court, in my view, does a great disservice to the District Judge who labored long and hard with this complex litigation by accusing him of changing horses in midstream and shifting the focus of this case from the pursuit of a remedy for the condition of segregation

---

[2] It does not appear that even the majority places any real weight on this consideration since it recognizes that interdistrict relief would be proper where a constitutional violation within one district produces a significant segregative effect in another district, see *ante,* at 744–745, thus allowing interdistrict relief to touch districts which have not themselves violated the Constitution.

within the Detroit school system to some unprincipled attempt to impose his own philosophy of racial balance on the entire Detroit metropolitan area. See *ante,* at 738–739. The focus of this case has always been the segregated system of education in the city of Detroit. The District Court determined that interdistrict relief was necessary and appropriate only because it found that the condition of segregation within the Detroit school system could not be cured with a Detroit-only remedy. It is on this theory that the interdistrict relief must stand or fall. Unlike the Court, I perceive my task to be to review the District Court's order for what it is, rather than to criticize it for what it manifestly is not.

## II

As the foregoing demonstrates, the District Court's decision to expand its desegregation decree beyond the geographical limits of the city of Detroit rested in large part on its conclusions (A) that the State of Michigan was ultimately responsible for curing the condition of segregation within the Detroit city schools, and (B) that a Detroit-only remedy would not accomplish this task. In my view, both of these conclusions are well supported by the facts of this case and by this Court's precedents.

## A

To begin with, the record amply supports the District Court's findings that the State of Michigan, through state officers and state agencies, had engaged in purposeful acts which created or aggravated segregation in the Detroit schools. The State Board of Education, for example, prior to 1962, exercised its authority to supervise local schoolsite selection in a manner which contributed to segregation. 484 F. 2d 215, 238 (CA6 1973). Furthermore, the State's continuing authority, after 1962,

to approve school building construction plans [3] had intertwined the State with site-selection decisions of the Detroit Board of Education which had the purpose and effect of maintaining segregation.

The State had also stood in the way of past efforts to desegregate the Detroit city schools. In 1970, for example, the Detroit School Board had begun implementation of its own desegregation plan for its high schools, despite considerable public and official resistance. The State Legislature intervened by enacting Act 48 of the Public Acts of 1970, specifically prohibiting implementation of the desegregation plan and thereby continuing the growing segregation of the Detroit school system. Adequate desegregation of the Detroit system was also hampered by discriminatory restrictions placed by the State on the use of transportation within Detroit. While state aid for transportation was provided by statute for suburban districts, many of which were highly urbanized, aid for intracity transportation was excepted. One of the effects of this restriction was to encourage the construction of small walk-in neighborhood schools in Detroit, thereby lending aid to the intentional policy of creating a school system which reflected, to the greatest extent feasible, extensive residential segregation. Indeed, that one of the purposes of the transportation restriction was to impede desegregation was evidenced when the Michigan Legislature amended the State Transportation Aid Act to cover intracity transportation but expressly prohibited the allocation of funds for cross-busing of students within a school district to achieve racial balance.[4]  Cf. *North Carolina State Board of Education* v. *Swann*, 402 U. S. 43 (1971).

---

[3] See Mich. Comp. Laws § 388.851 (1970).

[4] See § 388.1179.

Also significant was the State's involvement during the 1950's in the transportation of Negro high school students from the Carver School District past a closer white high school in the Oak Park District to a more distant Negro high school in the Detroit system. Certainly the District Court's finding that the State Board of Education had knowledge of this action and had given its tacit or express approval was not clearly erroneous. Given the comprehensive statutory powers of the State Board of Education over contractual arrangements between school districts in the enrollment of students on a nonresident tuition basis, including certification of the number of pupils involved in the transfer and the amount of tuition charged, over the review of transportation routes and distances, and over the disbursement of transportation funds,[5] the State Board inevitably knew and understood the significance of this discriminatory act.

Aside from the acts of purposeful segregation committed by the State Legislature and the State Board of Education, the District Court also concluded that the State was responsible for the many intentional acts of segregation committed by the Detroit Board of Education, an agency of the State. The majority is only willing to accept this finding *arguendo*. See *ante,* at 748. I have no doubt, however, as to its validity under the Fourteenth Amendment.

"The command of the Fourteenth Amendment," it should be recalled, "is that no 'State' shall deny to any person within its jurisdiction the equal protection of the laws." *Cooper* v. *Aaron,* 358 U. S. 1, 16 (1958). While a State can act only through "the officers or agents by whom its powers are exerted," *Ex parte Virginia,* 100 U. S. 339, 347 (1880), actions by an agent or officer of

[5] See §§ 388.629 and 340.600.

the State are encompassed by the Fourteenth Amendment for, "as he acts in the name and for the State, and is clothed with the State's power, his act is that of the State." *Ibid.* See also *Cooper* v. *Aaron, supra; Virginia* v. *Rives,* 100 U. S. 313, 318 (1880); *Shelley* v. *Kraemer,* 334 U. S. 1, 14 (1948).

Under Michigan law a "school district is an agency of the State government." *School District of the City of Lansing* v. *State Board of Education,* 367 Mich. 591, 600, 116 N. W. 2d 866, 870 (1962). It is "a legal division of territory, created by the State for educational purposes, to which the State has granted such powers as are deemed necessary to permit the district to function as a State agency." *Detroit Board of Education* v. *Superintendent of Public Instruction,* 319 Mich. 436, 450, 29 N. W. 2d 902, 908 (1947). Racial discrimination by the school district, an agency of the State, is therefore racial discrimination by the State itself, forbidden by the Fourteenth Amendment. See, *e. g., Pennsylvania* v. *Board of Trusts,* 353 U. S. 230 (1957).

We recognized only last Term in *Keyes* that it was the State itself which was ultimately responsible for *de jure* acts of segregation committed by a local school board. A deliberate policy of segregation by the local board, we held, amounted to "state-imposed segregation." 413 U. S., at 200. Wherever a dual school system exists, whether compelled by state statute or created by a local board's systematic program of segregation, "the *State* automatically assumes an affirmative duty 'to effectuate a transition to a racially nondiscriminatory school system' [and] to eliminate from the public schools within their school system 'all vestiges of state-imposed segregation.'" *Ibid.* (emphasis added).

Vesting responsibility with the State of Michigan for Detroit's segregated schools is particularly appropriate as

Michigan, unlike some other States, operates a single statewide system of education rather than several separate and independent local school systems. The majority's emphasis on local governmental control and local autonomy of school districts in Michigan will come as a surprise to those with any familiarity with that State's system of education. School districts are not separate and distinct sovereign entities under Michigan law, but rather are " 'auxiliaries of the State,' " subject to its "absolute power." *Attorney General of Michigan ex rel. Kies* v. *Lowrey,* 199 U. S. 233, 240 (1905). The courts of the State have repeatedly emphasized that education in Michigan is not a local governmental concern, but a state function.

> "Unlike the delegation of other powers by the legislature to local governments, education is not inherently a part of the local self-government of a municipality . . . . Control of our public school system is a State matter delegated and lodged in the State legislature by the Constitution. The policy of the State has been to retain control of its school system, to be administered throughout the State under State laws by local State agencies organized with plenary powers to carry out the delegated functions given [them] by the legislature." *School District of the City of Lansing* v. *State Board of Education, supra,* at 595, 116 N. W. 2d, at 868.

The Supreme Court of Michigan has noted the deep roots of this policy:

> "It has been settled by the Ordinance of 1787, the several Constitutions adopted in this State, by its uniform course of legislation, and by the decisions of this court, that education in Michigan is a matter of State concern, that it is no part of the local self-government of a particular township or munic-

ipality . . . . The legislature has always dictated the educational policy of the State." *In re School District No. 6*, 284 Mich. 132, 145-146, 278 N. W. 792, 797 (1938).

The State's control over education is reflected in the fact that, contrary to the Court's implication, there is little or no relationship between school districts and local political units. To take the 85 outlying local school districts in the Detroit metropolitan area as examples, 17 districts lie in two counties, two in three counties. One district serves five municipalities; other suburban municipalities are fragmented into as many as six school districts. Nor is there any apparent state policy with regard to the size of school districts, as they now range from 2,000 to 285,000 students.

Centralized state control manifests itself in practice as well as in theory. The State controls the financing of education in several ways. The legislature contributes a substantial portion of most school districts' operating budgets with funds appropriated from the State's General Fund revenues raised through statewide taxation.[6] The State's power over the purse can be and is in fact used to enforce the State's powers over local districts.[7] In addition, although local districts obtain funds through local property taxation, the State has assumed the responsibility to ensure equalized property valuations throughout the State.[8] The State also establishes

---

[6] See § 388.611. The State contributed an average of 34% of the operating budgets of the 54 school districts included in the original proposed desegregation area. In 11 of these districts, state contributions exceeded 50% of the operating budgets.

[7] See, *e. g., id.*, § 340.575. See also 1949–1950 Report of the Attorney General 104 (Roth); Vol. 1, 1955 Report of the Attorney General 561 (Kavanagh); 1961–1962 Report of the Attorney General 533 (Kelley).

[8] See Mich. Comp. Laws §§ 211.34 and 340.681.

standards for teacher certification and teacher tenure;[9] determines part of the required curriculum;[10] sets the minimum school term;[11] approves bus routes, equipment, and drivers;[12] approves textbooks;[13] and establishes procedures for student discipline.[14] The State Superintendent of Public Instruction and the State Board of Education have the power to remove local school board members from office for neglect of their duties.[15]

Most significantly for present purposes, the State has wide-ranging powers to consolidate and merge school districts, even without the consent of the districts themselves or of the local citizenry.[16] See, *e. g., Attorney General ex rel. Kies* v. *Lowrey,* 131 Mich. 639, 92 N. W. 289 (1902), aff'd, 199 U. S. 233 (1905). Indeed, recent years have witnessed an accelerated program of school district consolidations, mergers, and annexations, many of which were state imposed. Whereas the State had 7,362 local districts in 1912, the number had been reduced to 1,438 in 1964 and to 738 in 1968.[17] By June 1972, only 608 school districts remained. Furthermore, the State has broad powers to transfer property from one district to another, again without the consent of the local school districts affected by the transfer.[18] See, *e. g., School Dis-*

---

[9] § 340.569.

[10] §§ 257.811 (c), 340.361, 340.781, 340.782, 388.371.

[11] § 340.575.

[12] § 388.1171.

[13] § 340.887 (1).

[14] Op. Atty. Gen. No. 4705 (July 7, 1970), 1969–1970 Report of the Attorney General 156 (Kelley).

[15] See Mich. Comp. Laws § 340.253.

[16] See generally §§ 340.401–340.415 (consolidations), 340.431–340.449 (annexations).

[17] See 1 Michigan Senate Journal, 1968, p. 423.

[18] See generally Mich. Comp. Laws §§ 340.461–340.468

*trict of the City of Lansing* v. *State Board of Education, supra; Imlay Township District* v. *State Board of Education*, 359 Mich. 478, 102 N. W. 2d 720 (1960).

Whatever may be the history of public education in other parts of our Nation, it simply flies in the face of reality to say, as does the majority, that in Michigan, "[n]o single tradition in public education is more deeply rooted than local control over the operation of schools . . . ." *Ante,* at 741. As the State's Supreme Court has said: "We have repeatedly held that education in this State is not a matter of local concern, but belongs to the State at large." *Collins* v. *City of Detroit,* 195 Mich. 330, 335–336, 161 N. W. 905, 907 (1917). See also *Sturgis* v. *County of Allegan,* 343 Mich. 209, 215, 72 N. W. 2d 56, 59 (1955); *Van Fleet* v. *Oltman,* 244 Mich. 241, 244, 221 N. W. 299, 300 (1928); *Child Welfare Society of Flint* v. *Kennedy School District,* 220 Mich. 290, 296, 189 N. W. 1002, 1004 (1922). Indeed, a study prepared for the 1961 Michigan Constitutional Convention noted that the Michigan Constitution's articles on education had resulted in "the establishment of a state system of education in contrast to a series of local school systems." Elementary and Secondary Education and the Michigan Constitution, Michigan Constitutional Convention Studies 1 (1961).

In sum, several factors in this case coalesce to support the District Court's ruling that it was the State of Michigan itself, not simply the Detroit Board of Education, which bore the obligation of curing the condition of segregation within the Detroit city schools. The actions of the State itself directly contributed to Detroit's segregation. Under the Fourteenth Amendment, the State is ultimately responsible for the actions of its local agencies. And, finally, given the structure of Michigan's educational system, Detroit's segregation cannot be

viewed as the problem of an independent and separate entity. Michigan operates a single statewide system of education, a substantial part of which was shown to be segregated in this case.

## B

What action, then, could the District Court require the State to take in order to cure Detroit's condition of segregation? Our prior cases have not minced words as to what steps responsible officials and agencies must take in order to remedy segregation in the public schools. Not only must distinctions on the basis of race be terminated for the future, but school officials are also "clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." *Green* v. *County School Board of New Kent County,* 391 U. S. 430, 437–438 (1968). See also *Lee* v. *Macon County Board of Education,* 267 F. Supp. 458 (MD Ala.), aff'd *sub nom. Wallace* v. *United States,* 389 U. S. 215 (1967). Negro students are not only entitled to neutral nondiscriminatory treatment in the future. They must receive "what *Brown II* promised them: a school system in which all vestiges of enforced racial segregation have been eliminated." *Wright* v. *Council of the City of Emporia,* 407 U. S. 451, 463 (1972). See also *Swann* v. *Charlotte-Mecklenburg Board of Education,* 402 U. S. 1, 15 (1971). These remedial standards are fully applicable not only to school districts where a dual system was compelled by statute, but also where, as here, a dual system was the product of purposeful and intentional state action. See *Keyes,* 413 U. S., at 200–201.

After examining three plans limited to the city of Detroit, the District Court correctly concluded that none would eliminate root and branch the vestiges of

unconstitutional segregation. The plans' effectiveness, of course, had to be evaluated in the context of the District Court's findings as to the extent of segregation in the Detroit city schools. As indicated earlier, the most essential finding was that Negro children in Detroit had been confined by intentional acts of segregation to a growing core of Negro schools surrounded by a receding ring of white schools.[19] Thus, in 1960, of Detroit's 251

---

[19] Despite MR. JUSTICE STEWART's claim to the contrary, *ante,* at 756 n. 2, of his concurring opinion, the record fully supports my statement that Negro students were intentionally confined to a core of Negro schools within the city of Detroit. See, *e. g., supra,* at 784–785, 790–792. Indeed, MR. JUSTICE STEWART acknowledges that intentional acts of segregation by the State have separated white and Negro students within the city, and that the resulting core of all-Negro schools has grown to encompass most of the city. In suggesting that my approval of an interdistrict remedy rests on a further conclusion that the State or its political subdivisions have been responsible for the increasing percentage of Negro students in Detroit, my Brother STEWART misconceives the thrust of this dissent. In light of the high concentration of Negro students in Detroit, the District Judge's finding that a Detroit-only remedy cannot effectively cure the constitutional violation within the city should be enough to support the choice of an interdistrict remedy. Whether state action is responsible for the growth of the core of all-Negro schools in Detroit is, in my view, quite irrelevant.

The difficulty with MR. JUSTICE STEWART's position is that he, like the Court, confuses the inquiry required to determine whether there has been a substantive constitutional violation with that necessary to formulate an appropriate remedy once a constitutional violation has been shown. While a finding of state action is of course a prerequisite to finding a violation, we have never held that after unconstitutional state action has been shown, the District Court at the remedial stage must engage in a second inquiry to determine whether additional state action exists to justify a particular remedy. Rather, once a constitutional violation has been shown, the District Court is duty-bound to formulate an effective remedy and, in so doing, the court is entitled—indeed, it is required—to consider all the factual circumstances relevant to the framing of an effective decree. Thus, in *Swann* v. *Charlotte-Mecklenburg Board of Education*

regular-attendance schools, 100 were 90% or more white and 71 were 90% or more Negro. In 1970, of Detroit's 282 regular-attendance schools, 69 were 90% or more white and 133 were 90% or more Negro. While in 1960, 68% of all schools were 90% or more one race, by 1970, 71.6% of the schools fell into that category. The growing core of all-Negro schools was further evidenced in total school district population figures. In 1960 the Detroit system had 46% Negro students and 54% white students, but by 1970, 64% of the students were Negro and only 36% were white. This increase in the proportion of Negro students was the highest of any major Northern city.

It was with these figures in the background that the District Court evaluated the adequacy of the three Detroit-only plans submitted by the parties. Plan A, proposed by the Detroit Board of Education, desegregated the high schools and about a fifth of the middle-level schools. It was deemed inadequate, however, because it did not desegregate elementary schools and left the middle-level schools not included in the plan more segregated than ever. Plan C, also proposed by the Detroit Board, was deemed inadequate because it too covered only some grade levels and would leave elementary schools segregated. Plan B, the plaintiffs' plan, though requiring the transportation of 82,000 pupils and the acquisition of 900 school buses, would make little

we held that the District Court must take into account the existence of extensive residential segregation in determining whether a racially neutral "neighborhood school" attendance plan was an adequate desegregation remedy, regardless of whether this residential segregation was caused by state action. So here, the District Court was required to consider the facts that the Detroit school system was already predominantly Negro and would likely become all-Negro upon issuance of a Detroit-only decree in framing an effective desegregation remedy, regardless of state responsibility for this situation.

headway in rooting out the vestiges of segregation. To begin with, because of practical limitations, the District Court found that the plan would leave many of the Detroit city schools 75% to 90% Negro. More significantly, the District Court recognized that in the context of a community which historically had a school system marked by rigid *de jure* segregation, the likely effect of a Detroit-only plan would be to "change a school system which is now Black and White to one that would be perceived as Black . . . ." The result of this changed perception, the District Court found, would be to increase the flight of whites from the city to the outlying suburbs, compounding the effects of the present rate of increase in the proportion of Negro students in the Detroit system. Thus, even if a plan were adopted which, at its outset, provided in every school a 65% Negro-35% white racial mix in keeping with the Negro-white proportions of the total student population, such a system would, in short order, devolve into an all-Negro system. The net result would be a continuation of the all-Negro schools which were the hallmarks of Detroit's former dual system of one-race schools.

Under our decisions, it was clearly proper for the District Court to take into account the so-called "white flight" from the city schools which would be forthcoming from any Detroit-only decree. The court's prediction of white flight was well supported by expert testimony based on past experience in other cities undergoing desegregation relief. We ourselves took the possibility of white flight into account in evaluating the effectiveness of a desegregation plan in *Wright, supra,* where we relied on the District Court's finding that if the city of Emporia were allowed to withdraw from the existing system, leaving a system with a higher proportion of Negroes, it " 'may be anticipated that the pro-

portion of whites in county schools may drop as those who can register in private academies' . . . ." 407 U. S., at 464. One cannot ignore the white-flight problem, for where legally imposed segregation has been established, the District Court has the responsibility to see to it not only that the dual system is terminated at once but also that future events do not serve to perpetuate or re-establish segregation. See *Swann,* 402 U. S., at 21. See also *Green,* 391 U. S., at 438 n. 4; *Monroe* v. *Board of Comm'rs,* 391 U. S. 450, 459 (1968).

We held in *Swann, supra,* that where *de jure* segregation is shown, school authorities must make "every effort to achieve the greatest possible degree of actual desegregation." 402 U. S., at 26. This is the operative standard re-emphasized in *Davis* v. *School Comm'rs of Mobile County,* 402 U. S. 33, 37 (1971). If these words have any meaning at all, surely it is that school authorities must, to the extent possible, take all practicable steps to ensure that Negro and white children in fact go to school together. This is, in the final analysis, what desegregation of the public schools is all about.

Because of the already high and rapidly increasing percentage of Negro students in the Detroit system, as well as the prospect of white flight, a Detroit-only plan simply has no hope of achieving actual desegregation. Under such a plan white and Negro students will not go to school together. Instead, Negro children will continue to attend all-Negro schools. The very evil that *Brown I* was aimed at will not be cured, but will be perpetuated for the future.

Racially identifiable schools are one of the primary vestiges of state-imposed segregation which an effective desegregation decree must attempt to eliminate. In *Swann, supra,* for example, we held that "[t]he district judge or school authorities . . . will thus necessarily be concerned with the elimination of one-race schools." 402

U. S., at 26. There is "a presumption," we stated, "against schools that are substantially disproportionate in their racial composition." *Ibid.* And in evaluating the effectiveness of desegregation plans in prior cases, we ourselves have considered the extent to which they discontinued racially identifiable schools. See, *e. g., Green* v. *County School Board of New Kent County, supra; Wright* v. *Council of the City of Emporia, supra.* For a principal end of any desegregation remedy is to ensure that it is no longer "possible to identify a 'white school' or a 'Negro school.' " *Swann, supra,* at 18. The evil to be remedied in the dismantling of a dual system is the "[r]acial identification of the system's schools." *Green,* 391 U. S., at 435. The goal is a system without white schools or Negro schools—a system with "just schools." *Id.,* at 442. A school authority's remedial plan or a district court's remedial decree is to be judged by its effectiveness in achieving this end. See *Swann, supra,* at 25; *Davis, supra,* at 37; *Green, supra,* at 439.

We cautioned in *Swann,* of course, that the dismantling of a segregated school system does not mandate any particular racial balance. 402 U. S., at 24. We also concluded that a remedy under which there would remain a small number of racially identifiable schools was only presumptively inadequate and might be justified. *Id.,* at 26. But this is a totally different case. The flaw of a Detroit-only decree is not that it does not reach some ideal degree of racial balance or mixing. It simply does not promise to achieve actual desegregation at all. It is one thing to have a system where a small number of students remain in racially identifiable schools. It is something else entirely to have a system where all students continue to attend such schools.

The continued racial identifiability of the Detroit schools under a Detroit-only remedy is not simply a reflection of their high percentage of Negro students.

What is or is not a racially identifiable vestige of *de jure* segregation must necessarily depend on several factors. Cf. *Keyes,* 413 U. S., at 196. Foremost among these should be the relationship between the schools in question and the neighboring community. For these purposes the city of Detroit and its surrounding suburbs must be viewed as a single community. Detroit is closely connected to its suburbs in many ways, and the metropolitan area is viewed as a single cohesive unit by its residents. About 40% of the residents of the two suburban counties included in the desegregation plan work in Wayne County, in which Detroit is situated. Many residents of the city work in the suburbs. The three counties participate in a wide variety of cooperative governmental ventures on a metropolitan-wide basis, including a metropolitan transit system, park authority, water and sewer system, and council of governments. The Federal Government has classified the tri-county area as a Standard Metropolitan Statistical Area, indicating that it is an area of "economic and social integration." *United States* v. *Connecticut National Bank, ante,* at 670.

Under a Detroit-only decree, Detroit's schools will clearly remain racially identifiable in comparison with neighboring schools in the metropolitan community. Schools with 65% and more Negro students will stand in sharp and obvious contrast to schools in neighboring districts with less than 2% Negro enrollment. Negro students will continue to perceive their schools as segregated educational facilities and this perception will only be increased when whites react to a Detroit-only decree by fleeing to the suburbs to avoid integration. School district lines, however innocently drawn, will surely be perceived as fences to separate the races when, under a Detroit-only decree, white parents withdraw their chil-

dren from the Detroit city schools and move to the suburbs in order to continue them in all-white schools. The message of this action will not escape the Negro children in the city of Detroit. See *Wright,* 407 U. S., at 466. It will be of scant significance to Negro children who have for years been confined by *de jure* acts of segregation to a growing core of all-Negro schools surrounded by a ring of all-white schools that the new dividing line between the races is the school district boundary.

Nor can it be said that the State is free from any responsibility for the disparity between the racial makeup of Detroit and its surrounding suburbs. The State's creation, through *de jure* acts of segregation, of a growing core of all-Negro schools inevitably acted as a magnet to attract Negroes to the areas served by such schools and to deter them from settling either in other areas of the city or in the suburbs. By the same token, the growing core of all-Negro schools inevitably helped drive whites to other areas of the city or to the suburbs. As we recognized in *Swann:*

> "People gravitate toward school facilities, just as schools are located in response to the needs of people. The location of schools may thus influence the patterns of residential development of a metropolitan area and have important impact on composition of inner-city neighborhoods. . . . [Action taken] to maintain the separation of the races with a minimum departure from the formal principles of 'neighborhood zoning' . . . does more than simply influence the short-run composition of the student body . . . . It may well promote segregated residential patterns which, when combined with 'neighborhood zoning,' further lock the school system into the mold of separation of the races. Upon a proper

showing a district court may consider this in fashioning a remedy." 402 U. S., at 20–21.

See also *Keyes,* 413 U. S., at 202. The rippling effects on residential patterns caused by purposeful acts of segregation do not automatically subside at the school district border. With rare exceptions, these effects naturally spread through all the residential neighborhoods within a metropolitan area. See *id.,* at 202–203.

The State must also bear part of the blame for the white flight to the suburbs which would be forthcoming from a Detroit-only decree and would render such a remedy ineffective. Having created a system where whites and Negroes were intentionally kept apart so that they could not become accustomed to learning together, the State is responsible for the fact that many whites will react to the dismantling of that segregated system by attempting to flee to the suburbs. Indeed, by limiting the District Court to a Detroit-only remedy and allowing that flight to the suburbs to succeed, the Court today allows the State to profit from its own wrong and to perpetuate for years to come the separation of the races it achieved in the past by purposeful state action.

The majority asserts, however, that involvement of outlying districts would do violence to the accepted principle that "the nature of the violation determines the scope of the remedy." *Swann, supra,* at 16. See *ante,* at 744–745. Not only is the majority's attempt to find in this single phrase the answer to the complex and difficult questions presented in this case hopelessly simplistic, but more important, the Court reads these words in a manner which perverts their obvious meaning. The nature of a violation determines the scope of the remedy simply because the function of any remedy is to cure the violation to which it is addressed. In school segregation

cases, as in other equitable causes, a remedy which effectively cures the violation is what is required. See *Green,* 391 U. S., at 439; *Davis,* 402 U. S., at 37. No more is necessary, but we can tolerate no less. To read this principle as barring a district court from imposing the only effective remedy for past segregation and remitting the court to a patently ineffective alternative is, in my view, to turn a simple commonsense rule into a cruel and meaningless paradox. Ironically, by ruling out an interdistrict remedy, the only relief which promises to cure segregation in the Detroit public schools, the majority flouts the very principle on which it purports to rely.

Nor should it be of any significance that the suburban school districts were not shown to have themselves taken any direct action to promote segregation of the races. Given the State's broad powers over local school districts, it was well within the State's powers to require those districts surrounding the Detroit school district to participate in a metropolitan remedy. The State's duty should be no different here than in cases where it is shown that certain of a State's voting districts are malapportioned in violation of the Fourteenth Amendment. See *Reynolds* v. *Sims,* 377 U. S. 533 (1964). Overrepresented electoral districts are required to participate in reapportionment although their only "participation" in the violation was to do nothing about it. Similarly, electoral districts which themselves meet representation standards must frequently be redrawn as part of a remedy for other over- and under-inclusive districts. No finding of fault on the part of each electoral district and no finding of a discriminatory effect on each district is a prerequisite to its involvement in the constitutionally required remedy. By the same logic, no finding of fault on the part of the suburban school districts in this case

and no finding of a discriminatory effect on each district should be a prerequisite to their involvement in the constitutionally required remedy.

It is the State, after all, which bears the responsibility under *Brown* of affording a nondiscriminatory system of education. The State, of course, is ordinarily free to choose any decentralized framework for education it wishes, so long as it fulfills that Fourteenth Amendment obligation. But the State should no more be allowed to hide behind its delegation and compartmentalization of school districts to avoid its constitutional obligations to its children than it could hide behind its political subdivisions to avoid its obligations to its voters. *Reynolds* v. *Sims, supra,* at 575. See also *Gomillion* v. *Lightfoot,* 364 U. S. 339 (1960).

It is a hollow remedy indeed where "after supposed 'desegregation' the schools remained segregated in fact." *Hobson* v. *Hansen,* 269 F. Supp. 401, 495 (DDC 1967). We must do better than " 'substitute . . . one segregated school system for another segregated school system.' " *Wright,* 407 U. S., at 456. To suggest, as does the majority, that a Detroit-only plan somehow remedies the effects of *de jure* segregation of the races is, in my view, to make a solemn mockery of *Brown I*'s holding that separate educational facilities are inherently unequal and of *Swann*'s unequivocal mandate that the answer to *de jure* segregation is the greatest possible degree of actual desegregation.

### III

One final set of problems remains to be considered. We recognized in *Brown II,* and have re-emphasized ever since, that in fashioning relief in desegregation cases, "the courts will be guided by equitable principles. Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for

adjusting and reconciling public and private needs."
*Brown II,* 349 U. S., at 300. See also *Swann, supra.*

Though not resting its holding on this point, the majority suggests that various equitable considerations militate against interdistrict relief. The Court, for example, refers to financing and administrative problems, the logistical problems attending large-scale transportation of students, and the prospect of the District Court's becoming a *"de facto* 'legislative authority' " and " 'school superintendent' for the entire area." *Ante,* at 743–744. The entangling web of problems woven by the Court, however, appears on further consideration to be constructed of the flimsiest of threads.

I deal first with the last of the problems posed by the Court—the specter of the District Court *qua* "school superintendent" and "legislative authority"—for analysis of this problem helps put the other issues in proper perspective. Our cases, of course, make clear that the initial responsibility for devising an adequate desegregation plan belongs with school authorities, not with the District Court. The court's primary role is to review the adequacy of the school authorities' efforts and to substitute its own plan only if and to the extent they default. See *Swann,* 402 U. S., at 16; *Green,* 391 U. S., at 439. Contrary to the majority's suggestions, the District Judge in this case consistently adhered to these procedures and there is every indication that he would have continued to do so. After finding *de jure* segregation the court ordered the parties to submit proposed Detroit-only plans. The state defendants were also ordered to submit a proposed metropolitan plan extending beyond Detroit's boundaries. As the District Court stated, "the State defendants . . . bear the initial burden of coming forward with a proposal that promises to work." The state defendants defaulted in this obligation, however.

Rather than submit a complete plan, the State Board of Education submitted six proposals, none of which was in fact a desegregation plan. It was only upon this default that the District Court began to take steps to develop its own plan. Even then the District Court maximized school authority participation by appointing a panel representing both plaintiffs and defendants to develop a plan. Pet. App. 99a–100a. Furthermore, the District Court still left the state defendants the initial responsibility for developing both interim and final financial and administrative arrangements to implement interdistrict relief. *Id.*, at 104a–105a. The Court of Appeals further protected the interests of local school authorities by ensuring that the outlying suburban districts could fully participate in the proceedings to develop a metropolitan remedy.

These processes have not been allowed to run their course. No final desegregation plan has been proposed by the panel of experts, let alone approved by the District Court. We do not know in any detail how many students will be transported to effect a metropolitan remedy, and we do not know how long or how far they will have to travel. No recommendations have yet been submitted by the state defendants on financial and administrative arrangements. In sum, the practicality of a final metropolitan plan is simply not before us at the present time. Since the State and the panel of experts have not yet had an opportunity to come up with a workable remedy, there is no foundation for the majority's suggestion of the impracticality of interdistrict relief. Furthermore, there is no basis whatever for assuming that the District Court will inevitably be forced to assume the role of legislature or school superintendent.[20]

---

[20] In fact, the District Court remarked "that this court's task is to enforce constitutional rights not to act as a schoolmaster; the

Were we to hold that it was its constitutional duty to do so, there is every indication that the State of Michigan would fulfill its obligation and develop a plan which is workable, administrable, financially sound, and, most important, in the best interest of quality education for all of the children in the Detroit metropolitan area.

Since the Court chooses, however, to speculate on the feasibility of a metropolitan plan, I feel constrained to comment on the problem areas it has targeted. To begin with, the majority's questions concerning the practicality of consolidation of school districts need not give us pause. The State clearly has the power, under existing law, to effect a consolidation if it is ultimately determined that this offers the best prospect for a workable and stable desegregation plan. See *supra*, at 796–797. And given the 1,000 or so consolidations of school districts which have taken place in the past, it is hard to believe that the State has not already devised means of solving most, if not all, of the practical problems which the Court suggests consolidation would entail.

Furthermore, the majority ignores long-established Michigan procedures under which school districts may enter into contractual agreements to educate their pupils in other districts using state or local funds to finance nonresident education.[21] Such agreements could form an

---

court's task is to protect the constitutional rights here found violated with as little intrusion into the education process as possible. The court's objective is to establish the minimum constitutional framework within which the system of public schools may operate now and hereafter in a racially unified, non-discriminatory fashion. Within that framework the body politic, educators, parents, and most particularly the children must be given the maximum opportunity to experiment and secure a high quality, and equal, educational opportunity." Pet. App. 82a.

[21] See, *e. g.*, Mich. Comp. Laws §§ 340.69, 340.121 (d), 340.359, 340.582, 340.582a, 340.590.

easily administrable framework for interdistrict relief short of outright consolidation of the school districts. The District Court found that interdistrict procedures like these were frequently used to provide special educational services for handicapped children, and extensive statutory provision is also made for their use in vocational education.[22] Surely if school districts are willing to engage in interdistrict programs to help those unfortunate children crippled by physical or mental handicaps, school districts can be required to participate in an interdistrict program to help those children in the city of Detroit whose educations and very futures have been crippled by purposeful state segregation.

Although the majority gives this last matter only fleeting reference, it is plain that one of the basic emotional and legal issues underlying these cases concerns the propriety of transportation of students to achieve desegregation. While others may have retreated from its standards, see, *e. g., Keyes,* 413 U. S., at 217 (POWELL, J., concurring in part and dissenting in part), I continue to adhere to the guidelines set forth in *Swann* on this issue. See 402 U. S., at 29–31. And though no final desegregation plan is presently before us, to the extent the outline of such a plan is now visible, it is clear that the transportation it would entail will be fully consistent with these guidelines.

First of all, the metropolitan plan would not involve the busing of substantially more students than already ride buses. The District Court found that, statewide, 35%–40% of all students already arrive at school on a bus. In those school districts in the tri-county Detroit metropolitan area eligible for state reimbursement of transportation costs, 42%–52% of all students rode buses to school. In the tri-county areas as a whole, ap-

---

[22] See *id.,* §§ 340.330-340.330u.

proximately 300,000 pupils arrived at school on some type of bus, with about 60,000 of these apparently using regular public transit. In comparison, the desegregation plan, according to its present rough outline, would involve the transportation of 310,000 students, about 40% of the population within the desegregation area.

With respect to distance and amount of time traveled, 17 of the outlying school districts involved in the plan are contiguous to the Detroit district. The rest are all within 8 miles of the Detroit city limits. The trial court, in defining the desegregation area, placed a ceiling of 40 minutes one way on the amount of travel time, and many students will obviously travel for far shorter periods. As to distance, the average statewide bus trip is 8½ miles one way, and in some parts of the tri-county area, students already travel for one and a quarter hours or more each way. In sum, with regard to both the number of students transported and the time and distances involved, the outlined desegregation plan "compares favorably with the transportation plan previously operated . . . ." *Swann, supra,* at 30.

As far as economics are concerned, a metropolitan remedy would actually be more sensible than a Detroit-only remedy. Because of prior transportation aid restrictions, see *supra,* at 791, Detroit largely relied on public transport, at student expense, for those students who lived too far away to walk to school. Since no inventory of school buses existed, a Detroit-only plan was estimated to require the purchase of 900 buses to effectuate the necessary transportation. The tri-county area, in contrast, already has an inventory of 1,800 buses, many of which are now under-utilized. Since increased utilization of the existing inventory can take up much of the increase in transportation involved in the interdistrict remedy, the District Court found that only 350 additional buses would

probably be needed, almost two-thirds fewer than a Detroit-only remedy. Other features of an interdistrict remedy bespeak its practicality, such as the possibility of pairing up Negro schools near Detroit's boundary with nearby white schools on the other side of the present school district line.

Some disruption, of course, is the inevitable product of any desegregation decree, whether it operates within one district or on an interdistrict basis. As we said in *Swann,* however:

> "Absent a constitutional violation there would be no basis for judicially ordering assignment of students on a racial basis. All things being equal, with no history of discrimination, it might well be desirable to assign pupils to schools nearest their homes. But all things are not equal in a system that has been deliberately constructed and maintained to enforce racial segregation. The remedy for such segregation may be administratively awkward, inconvenient, and even bizarre in some situations and may impose burdens on some; but all awkwardness and inconvenience cannot be avoided . . . ." 402 U. S., at 28.

Desegregation is not and was never expected to be an easy task. Racial attitudes ingrained in our Nation's childhood and adolescence are not quickly thrown aside in its middle years. But just as the inconvenience of some cannot be allowed to stand in the way of the rights of others, so public opposition, no matter how strident, cannot be permitted to divert this Court from the enforcement of the constitutional principles at issue in this case. Today's holding, I fear, is more a reflection of a perceived public mood that we have gone far enough in enforcing the Constitution's guarantee of equal justice than it is the product of neutral principles of law. In

the short run, it may seem to be the easier course to allow our great metropolitan areas to be divided up each into two cities—one white, the other black—but it is a course, I predict, our people will ultimately regret. I dissent.